

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-0490-09

**SAUL CONTRERAS, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE EIGHTH COURT OF APPEALS
### EL PASO COUNTY

KELLER, P.J., delivered the opinion of the Court in which MEYERS, KEASLER, HERVEY, HOLCOMB and COCHRAN, JJ., joined. WOMACK, J., filed a concurring opinion. PRICE, J., concurred in Part I of the opinion and joined Part II of the opinion. JOHNSON, J., concurred.

### OPINION

Appellant was convicted of felony murder[1] in connection with the death of his twenty-two-

---

[1] *See* TEX. PENAL CODE § 19.02(b)(3). Appellant was charged with both capital murder and felony murder but was acquitted of capital murder. *See id.*, § 19.03(a)(8) (murder of child under age six). He was sentenced to ninety-nine years for felony murder. *See id.*, §§ 19.02(c) (murder as first-degree felony), 12.32 (punishment range for first-degree felony).

month-old niece, Jazmine. Appellant complains that the court of appeals erred in rejecting two of his contentions. The first contention at issue was that the trial court erred in refusing to submit instructions on the voluntariness of appellant's confession under article 38.23.[2] The second contention was that the submission of felony murder in the jury charge violated appellant's right to a unanimous verdict because multiple culpable mental states were submitted in the alternative for the underlying felony of injury to a child. We sustain one aspect of appellant's article 38.23 claim and reject his remaining complaints.

## I. ARTICLE 38.23 INSTRUCTION

### A. Background

#### 1. *Criminal Investigation*

##### *a. Events Leading up to Second Interview*

Appellant and his brother were married to two sisters. Appellant's brother and sister-in-law were having marital problems, so appellant's sister-in-law and her five children were living with appellant, his wife, and his wife's two children.

At 6:00 or 6:30 p.m. on November 28, 2003, the entire household, except for appellant and his two youngest nieces, went to Chuck-E-Cheese. Twenty-two-month-old Jazmine was originally supposed to go with the family but was left at home because she had fallen asleep on the couch. Jazmine had had a little diarrhea that day, but she had no injuries when the family left for the restaurant. At some point in the evening, appellant changed Jazmine's diaper. At around 9:30 or 10:00 p.m., the rest of the household returned home. Appellant told Jazmine's mother that Jazmine

---

[2] TEX. CODE CRIM. PROC. art 38.23.

had fallen off the couch, but that she had later watched television with him before he put her to bed. At around 11:00 p.m., Jazmine's mother checked on her and discovered that she was cold, pale, and stiff, and was not breathing. Jazmine was later pronounced dead.

Detective Jimmy Aguirre asked that appellant give a statement regarding his knowledge of the events. Although appellant was not under arrest or detention, at 3:05 a.m. on November 29, he received and waived *Miranda*[3] warnings. Appellant's written statement was completed at 6:10 a.m. In it, appellant confirmed the above events and otherwise related an exculpatory version of events.

Statements were taken from other family members, and appellant left the police station around 9:00 a.m. Since officers were still processing the home, appellant and the others stopped there to pick up some things, ran some errands, and went to appellant's mother's house.

At 4:03 p.m., Detective Aguirre went to the police station to discuss the results of Jazmine's autopsy. He was told that she suffered a ruptured spleen and had internal bleeding as a result of blunt force trauma to the abdomen. The autopsy report specified a number of injuries, both internal and external. The conclusion of the report was that Jazmine "died from internal bleeding due to blunt force injuries to the abdomen with tear of the small bowel mesentery." The report characterized the death as a result of physical abuse and classified the manner of death as homicidal. The medical examiner testified that the injuries would have immediately incapacitated Jazmine and resulted in her death within an hour. He also testified that, because her body temperature at 11:15 p.m. the previous day was eighty degrees and rigor mortis had set in at the jaw and upper extremities, he believed that she had been dead for a few hours by that point.

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

At 6:10 p.m., Detective Aguirre called appellant and asked him to return for another interview. According to Detective Aguirre, when appellant came to the phone, he said that he had been sleeping and had slept somewhat. Appellant testified at trial that he had only been able to lie down to rest for fifteen minutes since the first interview. Appellant further testified that Detective Aguirre had said that he himself had gotten some sleep earlier that day and asked if appellant had gotten any sleep, to which appellant replied, "No."[4]

At approximately 7:00 p.m., appellant arrived at the station with his wife, brother, and sister-in-law. Although "everybody was suspect," Detective Aguirre testified that, if the stories remained consistent, then appellant was "the one that had to have been in care and control of the child." Detective Aguirre did not believe that he had probable cause to arrest appellant at that point.

For the second interview, Detective Aguirre was joined by Detective Joe Ochoa. As before, appellant was given *Miranda* warnings. Appellant read the warnings from a card, initialed each warning, signed the card, and noted the date and time. He then agreed to waive his rights and talk to the officers. The oral portion of the interview lasted about two hours; writing out a statement, reviewing it and signing it took less than one additional hour. After the interview, appellant met with his wife and other family members before he was taken to jail.

*b. Detective Aguirre's Version of Second Interview*

Detective Aguirre testified that appellant never invoked any of his rights during the second interview. According to the detective, no threats or promises were made to appellant, nor did the officers threaten any members of appellant's family. Detective Aguirre testified that the officers

---

[4] Detective Aguirre testified that he himself had not slept at all during this period of time.

never suggested that appellant's wife was a suspect and never threatened to arrest her if appellant refused to confess. Detective Aguirre said that he was not aware that appellant's wife had a criminal record. According to the detective, appellant was allowed restroom breaks and given water to drink. Detective Aguirre testified that appellant never asked to make phone calls or to meet with anyone during the interview. Detective Aguirre acknowledged that it was possible that Detective Ochoa said, "I thought you said he was a good guy and a stand-up guy," but no yelling occurred during the interview. The detectives did not employ a good cop/bad cop strategy for this interview, according to Detective Aguirre, and near the end of the interview, appellant admitted to punching Jazmine four times in the stomach.

### b. Appellant's Version of Second Interview

Appellant related a different version of what happened in the interview. He said that when he was confronted by the officers with the results of the autopsy, he told them that he "didn't know anything about that." Detective Ochoa then "jumped in and started yelling" and said, "Stop lying."

According to appellant, Detective Aguirre told appellant that if it was not him, then it "would be" or "could be" his wife. Appellant testified that Detective Aguirre said that he knew that appellant's wife took care of the children during the week, that he knew that she had been arrested for driving while intoxicated, and that he knew that she had assaulted police officers when she was arrested. According to appellant, Detective Aguirre then displayed a piece of paper with appellant's wife's name on it, placed it in front of him, and said it was the police report showing that. Detective Aguirre stated that, if appellant's wife were arrested, then Child Protective Services would take their kids away.

According to appellant, Detective Aguirre also suggested to appellant that he became frustrated that night and began to hit Jazmine but that appellant was a "good guy," and Detective Aguirre knew that appellant "didn't mean it." Detective Aguirre allegedly told appellant that the autopsy showed four blows to the abdomen and suggested that appellant hit Jazmine at least four times. During this conversation, Detective Ochoa purportedly said, "Come on, you're not going to let your wife go to jail for something you did." According to appellant, when he responded that he had already told the detectives what he knew, Detective Ochoa replied, "Well, if it wasn't you, then it means your wife had to have done it." The detectives allegedly said that his wife's prior assault on officers showed that she had a bad temper.

Appellant further alleged that Detective Ochoa "kept yelling and jumping in, banging his hand on the desk" and "getting in" appellant's face, so that appellant could feel his breath, and saying, "Stop lying to us." According to appellant, Detective Ochoa looked at Detective Aguirre and said, "I thought you said he was a good guy. Look at him. He's lying."

Appellant testified that he repeatedly asked to see his wife but was told that he could not do so until the detectives could take something to their boss to show that appellant was cooperating. Detective Aguirre allegedly told appellant that if he "would sign or say what they were saying had happened," then they would let appellant see his wife. Appellant testified that he asked to speak to other family members and, again, the detectives declined to allow him to do so. Appellant also said that he said, "I need to speak to an attorney," but Detective Aguirre responded:

> Come on, Saul. You're just being selfish. We can't let you do that. If you do that, then we won't be able to talk to the Assistant D.A.'s on your behalf. We know you have a clean record. We know – you're a good guy. With your clean record, you'll

probably get a bond and be out by Monday, and then you can straighten all this out.

Detective Aguirre also allegedly told appellant that he had enough to arrest him, but if appellant "told them what they were saying," it would just be him. Otherwise, appellant said, they would arrest his sister-in-law and his wife as well. Appellant testified that the detectives also suggested that one of appellant's children could have been to blame by saying: "If it wasn't you then that means it had to be one of the kids."

Further, according to appellant, the detectives said that they had already talked to the assistant district attorney, and that that they would tell her that appellant was a "good guy," that he was "cooperating" and "very sorry," and that he "didn't mean for what happened." The detectives also allegedly told appellant they would recommend to the assistant district attorney that appellant receive a lower charge and a lower bond and that appellant would be "out by Monday and straighten everything out."

Appellant also said that the detectives told him that if he did not "say what they were saying," Jazmine's body would not be released, the investigation would continue, appellant and his family would not be allowed back into their house, and the family would not be able to arrange for Jazmine's burial.

Appellant testified that the officers' tactics caused him to confess:

Like I said, I was tired, exhausted. I didn't want my wife to go to jail. I didn't want them to take our kids away. I wanted to get out of that room. I wanted to talk to my family, and they weren't letting me do that until I said what they were saying.

### 2. *Jury Charge*

Appellant requested instructions on the "application of the law of confessions to the facts

herein" as follows:

> You are instructed that unless you believe from the evidence beyond a reasonable doubt that the alleged second confession or statement given to Detective Aguirre while Saul Contreras was confined at the Crimes Against Person's offices was freely and voluntarily made by Saul Contreras without compulsion or persuasion, or if you have a reasonable doubt thereof, you shall not consider such alleged statement or confession for any purpose nor any evidence obtained as a result thereof.

> In this case, if you find from the evidence, or if you have a reasonable doubt thereof, that prior to the giving of the alleged confession of the defendant, if any, the officer having him in charge questioned him persistently over a prolonged period of time without allowing him to contact his wife, attorney, or any other relative and without taking him before a magistrate without unnecessary delay then you will wholly disregard the alleged confession and not consider it for any purpose nor any evidence obtained as a result thereof.

> Further, if you find that Saul Contreras requested an attorney or that the interrogation cease you are instructed that such confession was obtained in violation of the law and you shall wholly disregard the alleged confession and not consider it for any purpose nor any evidence obtained as a result thereof.

> If you find from the evidence, or you have a reasonable doubt thereof, that at the time of the statement of Saul Contreras, if such statement there was, that Saul Contreras had been threatened with his wife's prosecution and losing his children and such threat reduced Saul Contreras to such a condition of physical and mental impairment such as to render such admission, if any, not wholly voluntary, then you will completely disregard such statement as evidence for any purpose nor will you consider, for any purpose any evidence obtained by the police as a result thereof.

The trial judge denied this request, but included in the jury charge the following instructions relating

to the voluntariness of a confession:

> The Court has admitted into evidence before you the alleged written statement of the Defendant, and you are instructed that before you may consider the same for any purpose you must first believe from the evidence beyond a reasonable doubt that the same was freely and voluntarily made by the Defendant without compulsion or persuasion and signed by him; and that prior thereto the Defendant had been warned by the person to whom the statement was made that:

(1) he had the right to remain silent and not make any statement at all and that any statement he made may be used against him at trial; and

(2) any statement he made may be used as evidence against him in court; and

(3) he had the right to have a lawyer present to advise him prior to and during any questioning; and

(4) if he was unable to employ a lawyer, he had the right to have a lawyer appointed to advise him prior to and during any questioning; and

(5) he had the right to terminate the interview at any time;

and that the Defendant prior to and during the making of the statement, knowingly, intelligently and voluntarily waived these rights; but if you do not so believe, or if you have a reasonable doubt thereof, then the alleged statement is entirely withdrawn from your consideration and you shall not give the same any force of effect whatever or consider it as any evidence of the Defendant's guilt in this case, and you shall not consider any evidence obtained as a result thereof, if any.

### 3. *Appeal*

On appeal, appellant asked: "Whether the trial court erred in failing to require the jury to find that his statement was voluntarily made in violation of his rights under the Texas Code of Criminal Procedure (TEX. CODE CRIM. PROC. arts. 38.21, 38.22 § 6, & 38.23)." In his brief, he quoted the first paragraph of his requested instruction as the pertinent part, though he included a copy of his complete request in an appendix. Appellant argued that, under article 38.23, he was entitled to a Fourteenth Amendment due process voluntariness instruction that clearly applied the law to the facts of the case. He explained that, though he received a jury instruction on the article 38.22 warnings, receipt of those warnings was never in issue. Rather, he contended that his own testimony indicated that the confession was involuntary without regard to the warnings. He cited the following facts as relevant to his voluntariness claim: (1) he had only about fifteen minutes of sleep since his

interrogation the night before, (2) he was interrogated by two detectives and accused of lying, the detectives suggested to him what to say, and he was threatened with his wife going to jail, (3) Detective Ochoa banged his hand on the desk, yelled at appellant, and got in his face, and (4) the detectives refused to allow appellant to speak to his wife, his mother, his brother, or a lawyer.

In addressing this claim, the court of appeals first discussed general legal principles regarding jury charge error, the instructions included in appellant's jury charge, appellant's requested instructions, general legal principles applicable to the submission of voluntariness instructions, and some of appellant's trial testimony.[5] The court then rejected appellant's claim, saying:

> The exclusionary rule, Article 38.23(a), is allowed "only if there is a factual dispute as to how the evidence was obtained." See *Vasquez*, 225 S.W.3d at 544. Here, it is undisputed that Appellant signed the second statement and was given his *Miranda* warnings.

> Because Appellant was not entitled to an Article 38.23(a) instruction, under Article 38.22 the court properly gave a general instruction on the voluntariness of Appellant's confession. See Tex.Code Crim. Proc. Ann. art. 38.22, § 7. Because the general instruction was adequate, we overrule Point of Error Six.[6]

### 4. *Discretionary Review*

Appellant's second ground for discretionary review reads: "The court of appeals erred in failing to find that a factual dispute existed which would entitle appellant to an application paragraph under Article 38.23(a)." Appellant claimed that the following facts were disputed: (1) whether appellant had gotten sleep, (2) whether appellant was threatened with his wife going to jail, (3)

---

[5] *Contreras v. State*, No. 08-06-00205-CR, 2009 Tex. App. LEXIS 91 at 26-33 (Tex. App.–El Paso January 8, 2009) (not designated for publication).

[6] *Contreras*, 2009 Tex. App. LEXIS 91 at 33.

whether the detectives had refused a request from appellant to speak to his wife, brother, sister-in-law, or mother, and (4) whether the detectives had refused a request from appellant to speak to a lawyer. In his brief, appellant also referenced the court of appeals's discussion of: (5) whether he was interrogated by two detectives and was accused of lying, and (6) whether Detective Ochoa yelled, banged his hand on a desk, and got in appellant's face.

## B. Analysis

### 1. *Overview*

In *Oursbourn v. State*, we explained that Texas law allows for jury instructions on three different types of "voluntariness" issues: (1) a general instruction on voluntariness under article 38.22 §6, (2) a warnings instruction under article 38.22 §7, and (3) a specific voluntariness instruction for constitutional due process claims under article 38.23.[7] Article 38.23 provides in relevant part:

> No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.
>
> In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.[8]

The trial court has a duty[9] to give an article 38.23 instruction sua sponte if three requirements are

---

[7] 259 S.W.3d 159, 173-74 (Tex. Crim. App. 2008).

[8] Tex. Code Crim. Proc. art. 38.23(a).

[9] *Oursbourn*, 259 S.W.3d at 180-81.

met: (1) evidence heard by the jury raises an issue of fact, (2) the evidence on that fact is affirmatively contested, and (3) the contested factual issue is material to the lawfulness of the challenged conduct in obtaining the statement claimed to be involuntary.[10] A statement is obtained in violation of constitutional due process only if the statement is causally related to coercive government misconduct.[11] Coercive government misconduct renders a confession involuntary if the defendant's "will has been overborne and his capacity for self-determination critically impaired."[12] Whether this has occurred is determined by assessing the "totality of all the surrounding circumstances," including "the characteristics of the accused and the details of the interrogation."[13]

The court of appeals discussed aspects of appellant's testimony that he claimed raised issues of fact regarding the voluntariness of his confession.[14] The appellate court agreed that this testimony was sufficient to support a finding that the confession was not voluntarily made, so that appellant was entitled to an instruction under article 38.22.[15] But the court of appeals did not expressly address whether this testimony also raised affirmatively contested fact issues that would entitle him to an instruction under article 38.23. Relying upon *Vasquez v. State*,[16] the court of appeals correctly stated

---

[10] *Id.* at 177.

[11] *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986); *Oursbourn*, 259 S.W.3d at 169-71.

[12] *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973).

[13] *Id.*

[14] *Contreras*, 2009 Tex. App. LEXIS 91 at 32-33.

[15] *Id.* at 33.

[16] 225 S.W.3d 541 (Tex. Crim. App. 2007).

that an article 38.23 instruction must be predicated upon a factual dispute, but the court then simply said that it was undisputed that appellant received *Miranda* warnings. Appellant, however, relied upon issues of fact other than receipt of the *Miranda* warnings to raise his voluntariness claim. The court of appeals's analysis of the article 38.23 issue was therefore incomplete.

In his petition, appellant contended that the appellate court "erred in failing to find a factual dispute" that would entitle him to an article 38.23 instruction. We turn to this issue.[17]

### 2. *Lack of Sleep*

Appellant contends that he raised a fact issue regarding the amount of sleep he had between his first and second written statements. Appellant's proposed jury instructions did not refer to his alleged lack of sleep, nor are we aware of any other place in the trial record in which appellant contended that he was entitled to an article 38.23 instruction on the matter. But because a trial judge has a duty to submit, sua sponte, an article 38.23 instruction that is raised by the evidence, we will address the merits of appellant's claim.

It is at least questionable whether there is an affirmative conflict in testimony between Detective Aguirre's statement that appellant had told him he had been sleeping and had slept somewhat and appellant's contention that he was only able to lie down for fifteen minutes to rest. Assuming, for the sake of argument, that appellant's alleged lack of sleep was an affirmatively contested fact issue, we nevertheless reject appellant's contention because a factual dispute regarding a lack of sleep was not material to the resolution of any due process involuntariness issue presented

---

[17] We decline to address the fifth and sixth alleged fact issues raised in appellant's brief—regarding the accusations of lying and Detective Ochoa's alleged yelling—because those issues were not raised in his petition.

to the court of appeals.

Appellant's alleged lack of sleep was not due to any coercive government misconduct.[18] Although appellant was kept up until the next morning giving his first statement, his presence was voluntary, there is no evidence suggesting that the police were purposefully attempting to deprive appellant of sleep, and there was a significant interval between the first and second statement during which appellant could have slept.

In an appropriate case, lack of sleep might be part of a larger narrative in a due process claim. A person might claim that police officers exploited his lack of sleep or that the lack sleep, in combination with other factors, caused his will to be overborne.[19] Appellant did not claim before the court of appeals, nor does he claim before us, that he should have received a jury instruction on lack of sleep within the context of a larger narrative. And because he never requested an instruction with respect to lack of sleep at trial, the court of appeals did not even have before it the text of an instruction that might have provided a broader context. All appellant has done throughout the appellate process with respect to this particular allegation is to argue that it was a disputed fact issue.

We recognized in *Oursbourn* that article 38.23 imposes upon a trial court the duty to submit a due process voluntariness instruction sua sponte when it is raised by the evidence, but we must also recognize that due process voluntariness instructions could come in myriad forms, depending upon the facts of particular cases. It is at least incumbent upon an appellant to explain to the appellate

---

[18] *Cf. Ashcraft v. Tennessee*, 322 U.S. 143, 154 (1944) (confession held involuntary where prosecutors served in relays to keep the suspect under continuous cross-examination for thirty-six hours without rest or sleep).

[19] *See Greenwald v. Wisconsin*, 390 U.S. 519, 521 (1968).

court what instruction he desired.[20]  Only then can the appellate court be expected to intelligently assess whether such an instruction was required, and if so, whether the defendant suffered harm, and if the instruction was not requested at trial, whether he was egregiously harmed.[21]  We therefore consider only whether appellant was entitled to a jury instruction that lack of sleep, by itself, rendered his confession involuntary, and we decline to consider whether appellant might have been entitled to an instruction on lack of sleep within a broader (but specified) context.  Because we conclude that a lack of sleep would not, by itself, render a confession involuntary under due process, we reject appellant's contention.

### 3. *Threat to Jail the Wife*

An affirmative factual dispute did exist with respect to whether the police threatened to arrest appellant's wife.  The State contends that appellant's "description of the detectives' threats to arrest his wife if he did not confess appear more akin to mere trickery or deception about the state of the evidence as to the source and cause of Jazmine's injuries rather than overt threats to arrest [appellant's] wife if he did not confess."  Although some of appellant's testimony did conform to the State's characterization, appellant's testimony described at least one explicit threat to arrest his wife if he did not confess.  Given that we must view the evidence at trial in the light most favorable

---

[20] *See Roberts v. State*, 273 S.W.3d 322, 326 (Tex. Crim. App. 2008) (declining to address a component of the defendant's ground for review because he did not present the issue to the court of appeals).

[21] *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (discussing "some harm" and "egregious harm" standards).

to submitting a defensive instruction,[22] we cannot agree with the State that the defendant's testimony alleged mere deception by the police about the state of the evidence during the investigation.

Also, appellant's requested instruction with respect to threats to his wife[23] included a requirement that, before excluding the confession from consideration, the jury find that the threats reduced appellant "to such a condition of physical and mental impairment such as to render such admission, if any, not wholly voluntary." The court of appeals was, therefore, on notice that appellant was claiming that alleged threats against his wife caused his will to be overborne.

The Supreme Court has recognized that threats against family members can result in an involuntary confession. In *Harris v. South Carolina*, the Court found a confession to be involuntary based upon a number of circumstances that included a threat to arrest the suspect's mother.[24] In *Lynumn v. Illinois*, the Court found a confession to be involuntary under circumstances that included threatening to take away the suspect's children.[25] Several lower courts have likewise recognized that a threat against a family member may result, under the totality of the circumstances, in an involuntary confession.[26]

---

[22] *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006).

[23] Although the requested jury instruction also addressed a threat of losing the children, appellant does not now complain about that aspect of his request, nor did he complain about it before the court of appeals. Consequently, we have no occasion to address it.

[24] 338 U.S. 68, 69-71 (1949) (detailing the circumstances); *id.* at 70 (threat to arrest mother).

[25] 372 U.S. 528, 534 (1963).

[26] *See United States v. Finch*, 998 F.2d 349, 355-356 (6th Cir. 1993) (confession rendered involuntary regardless of whether the officers told the defendant they "would" or "might" arrest the female occupants of the house); *Johnson v. Trigg*, 28 F.3d 639, 642 (7th Cir. 1994) ("a number of

Three federal circuits and two state high courts have held that law enforcement officials can threaten to arrest a family member, without vitiating the voluntariness of a confession, if they can lawfully effectuate such an arrest (*i.e.*, if there is probable cause to arrest).[27] We need not decide

cases hold or suggest that hostage-taking is an impermissibly coercive interrogation tactic even where the person being interrogated is an adult"); *United States v. Tingle*, 658 F.2d 1332, 1336 (9th Cir. 1981) (clear objective of interrogation was to create fear in the suspect that, if she refused to cooperate, she would not see her child for a long period of time); *Brisbon v. United States*, 957 A.2d 931, 945 (D.C. App. 2008) (officers falsely told suspect that mother and grandmother had been arrested: "cautioning that the kind of deception employed here, involving supposed harm to vulnerable family members, could well cross the line beyond the type of tactics *vel non* that a court will tolerate"). *See also* the following cases pre-dating *Schneckloth*: *People v. Trout*, 54 Cal. 2d 576, 585, 354 P.2d 231, 236 (1960) (implied threat that wife would be held until suspect confessed); *Hall v. Indiana*, 255 Ind. 606, 610-11, 266 N.E.2d 16, 19 (1971) (threat to charge and convict wife used to encourage suspect to confess).

[27] *Allen v. McCotter*, 804 F.2d 1362, 1364 (5th Cir. 1986) (police had probable cause to arrest wife for aiding a robbery); *United States v. Johnson*, 351 F.3d 254, 263 (6th Cir. 2003) ("whether the threat to prosecute . . . was coercive turns on the issue of whether the threat could have been lawfully executed. Whether the police could have lawfully arrested . . . in turn depends on whether the investigating officers had probable cause"—probable cause existed, so threat did not constitute coercive conduct); *Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001) ("whether a threat to prosecute a third party was coercive depends upon whether the state had probable cause to believe that the third party had committed a crime at the time the threat was made"—suspect's girlfriend's own statement established her participation in the crime); *Armstead v. State*, 978 So. 2d 642, 648 (Miss. 2008) ("Threats to arrest a defendant's family member(s) do not render a confession involuntary so long as probable cause exists to arrest such persons." Because the cocaine was found in the kitchen, probable cause existed to arrest the suspect's wife. Citing *Allen*); *State v. Perez*, 124 Ohio St. 3d 122, 131-32, 920 N.E.2d 104, 119-20 (2009) ("Threats to arrest members of a suspect's family may cause a confession to be involuntary. The issue turns on whether the threat could have been lawfully executed." [citations, internal quotation marks, and ellipses omitted] "Because the officers could have lawfully arrested [the suspect's wife], threatening to do so was not a coercive tactic."). *See also Commonwealth v. Raymond*, 424 Mass. 382, 396, 676 N.E.2d 824, 834 (1997) ("While the police may not expressly bargain with the defendant over the release of other individuals or make threats of arresting and charging others with no basis, where this type of conduct is absent, the police may bring to the defendant's attention the possibility that his relatives may be culpable." [citation omitted] Citing *Allen*); *Brisbon*, 957 A.2d at 946 n.17 ("Some courts draw a distinction between deceptive and truthful pressure tactics involving family members." Citing *Johnson* and *Armstead*); *Trout*, 54 Cal. 2d at 584-85, 354 P.2d at 236 (no effort made by police to conduct an

whether to adopt such a rule, however, because the detectives in the present case did not have probable cause to arrest appellant's wife. Detective Aguirre admitted that the evidence obtained by law enforcement prior to appellant's second statement pointed to appellant being the care giver at the time Jazmine's injuries were sustained. The existence of severe injuries that would have immediately incapacitated the child, along with medical evidence showing that the child had been dead for several hours, placed the injuries squarely within a time period in which appellant was the only adult present. Detective Aguirre suggested that it was possible that the second round of statements from appellant and other family members could provide conflicting information on who was present with Jazmine at the time the injuries occurred, but nothing in the record shows that happened. We conclude that the evidence did raise a fact issue regarding whether a threat to arrest and prosecute his wife rendered appellant's confession involuntary under due process.

### 4. *Isolation from Family and Attorney*

Appellant's allegation that he raised fact issues with respect to his ability to talk to his family or to an attorney appears to relate to the second paragraph of his requested instructions, which would have required that the jury disregard the confession if it found that the officers "questioned [appellant] persistently over a prolonged period of time without allowing him to contact his wife, attorney, or any other relative." This appears to be an allegation that he was forcibly held incommunicado for a prolonged period of time—a practice condemned in *Haynes v. Washington*.[28]

---

investigation of wife's self-exculpatory statements regarding her whereabouts on the night of the crimes).

[28] *See* 373 U.S. 503, 514 (1963) (condemning "secret and incommunicado detention").

In *Haynes*, the police placed the defendant on what was locally called a "small book" for investigation purposes.[29] Under police department policy, a suspect placed on a "small book" was not permitted to make phone calls or have visitors.[30] Pursuant to this policy, the police held the defendant for sixteen hours without allowing him to communicate with the outside world—uniformly denying the defendant's requests to call his wife and to call an attorney.[31] The officers told the defendant "that he might call his wife only if he 'cooperated' and gave the police a statement."[32] And in fact, the defendant was first allowed to call his wife five to seven days after his arrest.[33] The Supreme Court concluded, "from all of the facts presented, that the bounds of due process have been exceeded."[34] Following *Haynes*, in *Darwin v. Connecticut*,[35] the Court found a confession to be involuntary when the defendant was denied access to counsel and the outside world for thirty to forty-eight hours.[36]

Various courts have distinguished their cases from *Haynes* on several bases: (1) that the

---

[29] *Id.* at 505.

[30] *Id.*

[31] *Id.* at 504-05.

[32] *Id.* at 509-10.

[33] *Id.* at 512.

[34] *Id.* at 515; *see also Morris v. State,* 488 S.W.2d 768, 773 (Tex. Crim. App. 1973) (discussing *Haynes*).

[35] 391 U.S. 346 (1968).

[36] *Id.* at 349-50.

suspect was not held incommunicado for as long,[37] (2) that the authorities did not tell the suspect that

he would remain incommunicado until he confessed,[38] (3) that the suspect was given *Miranda*

warnings,[39] or (4) that the combination of circumstances present in *Haynes* was not present.[40]

---

[37] *United States ex rel. Lathan v. Deegan*, 450 F.2d 181, 184, 184 n.9 (2ᵈ Cir. 1971) (referring to *Haynes* as proscribing "prolonged incommunicado detention" and explaining that the "length of incarceration here appears deceptive" and "no session lasted more than an hour and the total length of all sessions was less than eight hours"); *United States ex rel. Hughes v. McMann*, 405 F.2d 773, 777 (2ᵈ Cir. 1968) (referring to "the longer time interval in *Haynes*"); *People v. Ramey*, 152 Ill. 2d 41, 58, 604 N.E.2d 275, 283 (1992) (In contrast to *Haynes*, the "defendant here was held for only approximately 6 hours, at most, in presumably incommunicado detention before giving his alleged inculpatory statement to the police.").

[38] *United States v. Dickens*, 695 F.2d 765, 778 (3ᵈ Cir. 1982) (In *Haynes*, "the police threatened the defendant with continued incommunicado detention and promised him access to his family only if he signed an inculpatory written statement." The defendant here "has made no such allegations."); *Hughes*, 405 F.2d at 777 (In finding that the refusal to allow the defendant to contact his sister did not render the confession involuntary: "What made Haynes' confession involuntary in the view of the majority was not simply his incommunicado detention but the threat that the police would continue this until Haynes did what they wanted of him; confession, in other words, was made the price of access to his family. Even on Hughes' version there was nothing of that sort here."); *State v. Benton*, 413 A.2d 104, 109 (R.I. 1980) ("Even assuming that defendant requested and was denied an opportunity to speak with his aunt or his mother, there is no evidence that he was being held incommunicado or 'confronted with the express threat of continued incommunicado detention and induced by the promise of communication with and access to family.'").

[39] *Ramey*, 152 Ill. 2d at 58-59, 604 N.E.2d at 283 ("[E]ven assuming that, as defendant testified during the hearing on his motion to suppress, he asked, but was not permitted, to use the telephone prior to making his alleged inculpatory statement, that fact would not invalidate defendant's statement as a matter of law. . . . [The] defendant, unlike the defendant in *Haynes* . . ., was advised of his *Miranda* rights several times before giving his alleged inculpatory statement."); *Benton*, 413 A.2d at 109 (The "defendant was adequately and effectively apprised of all his rights under the *Miranda* decision.")

[40] *United States ex rel. Dickerson v. Rundle*, 430 F.2d 462, 465 (3ᵈ Cir. 1970) ("In virtually every case relied upon by Dickerson in support of the involuntariness claim -- *Davis*, *Haynes*, *Culombe*, *Spano*, *Cicenia*, and *Crooker* -- the failure to caution the accused of his rights or an outright refusal to honor a request for counsel was but one factor in a blend of ingredients from which a conclusion of coercion was extracted. We find no such blend here.").

In this case, the relevant portions of appellant's requested jury charge contained two factual allegations: (1) that the police refused requests to talk to family members or to an attorney, and (2) that this occurred over a prolonged period. There was clearly a factual dispute about the first allegation, but there was no factual dispute about the second because it was uncontroverted that the interrogation lasted about two hours. The length of the interrogation could be an appropriate background fact that is relevant to whether the disputed fact is material to a due process involuntariness inquiry. But, assuming *arguendo* that refusing access to family and an attorney over a long time period would give rise to an inference that a confession was involuntary, two hours would not be sufficient to give rise to such an inference.

Appellant testified that the detectives told him that he had to confess before he could talk to his wife. That testimony created a disputed fact issue. But appellant did not request a jury charge incorporating that disputed fact issue, nor did he argue it before the court of appeals. Moreover, appellant did not claim, on trial or on appeal, that he should have received an instruction that his alleged isolation from the outside world for a period of time caused his will to be overborne. As we have explained in connection with the lack-of-sleep allegation, a defendant must explain to the appellate court what instruction he desired before he can complain about the appellate court's failure to find that he was entitled to such an instruction.

### 5. *Invocation of Right to Counsel*

The disputed fact issue regarding whether appellant requested an attorney also related to a separate requested instruction that would have required the jury to disregard the confession if it determined that appellant requested an attorney. Appellant received instructions regarding the

administration of warnings and waiver of rights, including the right to counsel, under article 38.22.[41] We address here whether he should have received a separate instruction pursuant to article 38.23.

As we have explained above, article 38.23 requires, among other things, the exclusion of evidence "obtained . . . in violation of any provisions of the Constitution . . . . of the United States of America" and a jury instruction if a fact issue is raised in that regard.[42] Essentially, the question here is whether the failure to scrupulously honor a suspect's invocation of his right to counsel under *Miranda* constitutes a violation of the United States Constitution.

In *Oursbourn*, we compared and contrasted *Miranda* claims with "due process" claims and Texas statutory claims.[43] We suggested that "due process" and "*Miranda*" claims "may" warrant both general and specific voluntariness instructions,[44] but we had no actual occasion to address the propriety of an article 38.23 instruction for a *Miranda* claim.[45] In an earlier case, *Baker v. State*, we expressly held that taking a statement in violation of the guidelines set forth in *Miranda* does not constitute a "violation of the law" within the meaning of article 38.23.[46]

---

[41] *See* TEX. CODE CRIM. PROC. art. 38.22, §§ 2, 3, 7.

[42] Art. 38.23(a).

[43] 259 S.W.3d at 169-74.

[44] *Id.* at 174.

[45] *See id.* at 177 (using "officer holds a gun to the defendant's head" example) and 181-82 (discussing the fact that there was no evidence of police overreaching envisioned by the Supreme Court in *Connelly*). Elsewhere in the opinion, we grouped *Miranda* together with the warnings requirements contained in article 38.22. *Id.* at 169 (referring to, as one of three voluntariness theories, "*Miranda v. Arizona* as expanded in Article 38.22, §§2 and 3").

[46] 956 S.W.2d 19, 23-24 (Tex. Crim. App. 1997).

The Supreme Court has since confirmed the "constitutional" nature of the *Miranda* rule in *Dickerson v. United States*, holding that Congress could not abrogate the rule by statute.[47] The issue, though, is what kind of constitutional rule we are talking about. Is there a substantive constitutional right to be free from police interrogation that violates *Miranda*, or is there merely a procedural constitutional right to have a statement excluded if the *Miranda* guidelines are not met? In *Baker*, we indicated that the latter was the case: "[Q]uestioning in violation of *Miranda* is not itself illegal . . . . [T]he *Miranda* requirements embody an exclusionary rule or remedy rather than a substantive right or entitlement."[48]

This distinction may be illustrated by contrasting Fourth Amendment search and seizure protections with *Miranda* protections. If a violation of the Fourth Amendment occurs because a search is conducted without probable cause, the search itself is the constitutional violation, regardless of whether any evidence obtained in the search is admitted in a judicial proceeding. A civil rights lawsuit could, in fact, be founded solely upon the unconstitutional search, even if no evidence were discovered. In contrast, *Baker* suggests that police officers do not commit a constitutional violation simply by failing to give *Miranda* warnings during a custodial interrogation. A constitutional violation is established only if the evidence obtained is later admitted in a judicial proceeding. This conclusion is consistent with the language in *Dickerson* and with the holding in the subsequent case

---

[47] 530 U.S. 428 (2000).

[48] *Baker*, 956 S.W.2d at 24; *see also Henderson v. State*, 962 S.W.2d 544, 553 (Tex. Crim. App. 1997) ("As for the *Miranda* rule, it does not actually prohibit law enforcement officers from eliciting statements without the appropriate warnings; the rule merely prevents the admission of such statements into evidence.").

of *Chavez v. Martinez*.[49]

In *Dickerson*, the Supreme Court characterized the constitutional violation articulated by

*Miranda* as the admission of evidence obtained in derogation of the procedural guidelines outlined

in the *Miranda* opinion:

> In *Miranda v. Arizona*, we held that certain warnings must be given before a suspect's statement made during custodial interrogation could be admitted in evidence. In the wake of that decision, Congress enacted 18 U.S.C. § 3501, which in essence laid down a rule that the admissibility of such statements should turn only on whether or not they were voluntarily made. We hold that *Miranda*, being a constitutional decision of this Court, may not be in effect overruled by an Act of Congress, and we decline to overrule *Miranda* ourselves. We therefore hold that *Miranda* and its progeny in this Court govern the admissibility of statements made during custodial interrogation in both state and federal courts.[50]

Moreover, the Supreme Court held, after *Dickerson*, that the failure of law enforcement

officers to follow *Miranda*'s guidelines does not by itself establish a constitutional violation.  In

*Chavez*, a plaintiff filed a civil rights action under 42 U.S.C. § 1983,[51] alleging, among other things,

that his constitutional rights were violated by a police officer's failure to give *Miranda* warnings

during a custodial interrogation.[52]  The plaintiff's answers during that interview were never used

---

[49]  538 U.S. 760 (2003).

[50]  *Dickerson*, 530 U.S. at 431-432 (citation omitted).

[51] § 1983 provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...."

[52]  *Chavez*, 583 U.S. at 764-765.

against him in any criminal prosecution.[53] Justice Thomas, joined by Chief Justice Rehnquist and Justices O'Connor and Scalia said:

> Statements compelled by police interrogations of course may not be used against a defendant at trial, see *Brown v. Mississippi*, but it is not until their use in a criminal case that a violation of the Self-Incrimination Clause occurs, see *United States v. Verdugo-Urquidez* ("The privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental *trial* right of criminal defendants. Although conduct by law enforcement officials prior to trial may ultimately impair that right, *a constitutional violation occurs only at trial*").[54]

Justice Thomas concluded: "Accordingly, Chavez's failure to read *Miranda* warnings to Martinez did not violate Martinez's constitutional rights and cannot be grounds for a § 1983 action."[55] Justice Kennedy, joined by Justice Stevens, stated: "I agree with Justice Thomas that failure to give a *Miranda* warning does not, without more, establish a completed violation when the unwarned interrogation ensues."[56] And Justice Souter, joined by Justice Breyer, rejected the contention that the plaintiff had shown a stand-alone violation of the Fifth Amendment privilege sufficient to give rise to civil liability.[57] Although *Chavez* was a fractured decision, eight of the justices expressed their agreement with the proposition that the failure of the police to give warnings during a custodial interrogation is not itself a constitutional violation.

---

[53] *Id.* at 764.

[54] *Chavez*, 538 U.S. at 767 (Thomas, J., announcing the judgment of the Court) (citations omitted, emphasis in *Chavez*).

[55] *Id.* at 772.

[56] *Id.* at 789 (Kennedy, J., concurring in part and dissenting in part).

[57] *Id.* at 778 (Souter, J., concurring).

The clear import of *Chavez* is that the *Miranda* rule is an exclusionary rule in the same way that article 38.23 is an exclusionary rule. *Miranda* does not set forth substantive constitutional rights with regard to interrogations; rather, that decision and its progeny set up rules for the admission of certain statements by the accused – excluding a statement under certain conditions when it is determined that law enforcement failed to observe certain practices during a custodial interrogation. The failure to observe those practices – give warnings, honor warnings, etc. – is not itself a constitutional violation, but the admission, in certain circumstances, of a statement that was taken without observing those practices is. *Miranda* is not violated until the statement is admitted into evidence in a criminal proceeding, and then only if an "exception" to *Miranda* does not apply.[58] Although we have sometimes referred to the bare failure to give warnings, or to honor an invocation of rights, as a violation of *Miranda*, such references are not technically accurate. Police officers may fail to follow guidelines set forth in *Miranda*, but they cannot, properly speaking, violate *Miranda*. Only a court, by admitting evidence that *Miranda* proscribes, can violate *Miranda.*

Since the failure of police officers to honor the invocation of rights under *Miranda* is not itself a violation of the United States Constitution, it cannot be a basis for invoking article 38.23. While a constitutional violation may be established if an unwarned statement is admitted at trial, the act of admission is not the "obtaining" of evidence. The structure of article 38.23 clearly contemplates that the evidence is "obtained" at a prior point in time and then prevented by the statute from being admitted. To hold otherwise would require that article 38.23 somehow retroactively

---

[58] *See Harris v. New York*, 401 U.S. 222 (1971) (statement taken in violation of *Miranda* guidelines is admissible for impeachment).

render evidence inadmissible after it is admitted, since it is the admission itself that violates the constitution. This absurdity results because an attempt to invoke *Miranda* through article 38.23 is really the stacking of one exclusionary rule on top of another.

And the distinction between an exclusionary rule and a substantive right for article 38.23 purposes has practical importance. Under Supreme Court precedent, for example, the "fruits" of a non-*Miranda*-compliant statement are admissible.[59] But if article 38.23 were held to apply to a non-*Miranda*-compliant statement, then the fruits of the statement would also be inadmissible under article 38.23.[60] *Miranda* or article 38.22, not article 38.23, is the vehicle for excluding statements obtained in violation of the *Miranda* guidelines. And because *Miranda* claims do not fall within the ambit of article 38.23, a defendant is not entitled to a jury instruction under that statute. Article 38.22, not article 38.23, is the appropriate vehicle for obtaining a jury instruction regarding a purported violation of *Miranda*, to the extent such a vehicle is available.

## II. JURY UNANIMITY

### A. Background

Count two of appellant's indictment alleged that he:

> did then and there commit the felony offense of Injury to a Child by intentionally, knowingly, recklessly, or by criminal negligence, by act, cause bodily injury to JAZMINE CONTRERAS, a child younger than 15 years of age, by then and there striking JAZMINE CONTRERAS about the body with the hand of the defendant, and while in the course of and in furtherance of the commission of said offense did then and there commit an act clearly dangerous to human life, to wit: by striking

---

[59] *See Baker*, 956 S.W.2d at 22-23 (discussing *Michigan v. Tucker*, 417 U.S. 433 (1974); *Oregon v. Elstad*, 470 U.S. 298 (1985); and TEX. CODE CRIM.PROC. art. 38.23).

[60] *Id.* at 22-24.

JAZMINE CONTRERAS about the body with the hand of the defendant and did thereby cause the death of an individual, namely JAZMINE CONTRERAS.

The jury charge tracked the language of the indictment. The offense thus charged was felony murder,[61] containing the underlying felony of injury to a child.[62] Four culpable mental states were alleged in the alternative for the underlying felony: intentionally, knowingly, recklessly, and with criminal negligence.

On appeal, appellant contended that the alternative submission of these culpable mental states violated his right to a unanimous verdict. Relying upon *White v. State*,[63] the court of appeals rejected this contention.[64] Appellant now argues that his case is distinguishable from *White* because the different culpable mental states create offenses that are not morally and conceptually equivalent.[65]

### B. Analysis

The felony murder statute provides that a person commits murder if he "commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or

---

[61] *See* TEX. PENAL CODE §19.02(b)(3).

[62] *See id.*, §22.04(a)(3), (c)(1).

[63] 208 S.W.3d 467 (Tex. Crim. App. 2006).

[64] *Contreras*, No. 08-06-00205-CR, 2009 Tex. App. LEXIS 91 at 38-42.

[65] Appellant's third ground for discretionary review reads: "The court of appeals erred in holding that appellant was not entitled to an unanimous verdict as to the underlying predicate offenses of either intentional or knowing injury to a child, reckless injury to a child or criminally negligent injury to a child as those separate offenses are not morally and conceptually equivalent."

attempts to commit an act clearly dangerous to human life that causes the death of an individual."[66]

Essentially, the State must prove (1) an underlying felony,[67] (2) an act clearly dangerous to human life,[68] (3) the death of an individual, (4) causation (the dangerous act causes the death), and (5) a connection between the underlying felony and the dangerous act ("in the course of and in furtherance of . . . or in immediate flight from"). The offense of "injury to a child" can qualify as an underlying felony in a felony murder prosecution.[69]

In *White*, we held that the felony murder statute simply required jury agreement that a "felony" was committed; "specifically named felonies" were "not elements about which a jury must be unanimous."[70] We further held that dispensing with jury unanimity for the underlying felonies of "unauthorized use of a vehicle" and "evading arrest or detention in a vehicle" did not violate due process because the felonies were "basically morally and conceptually equivalent."[71]

Appellant relies upon this last passage in *White* to argue that the submission of different culpable mental states for the injury-to-a-child offense resulted in the submission of alternative

---

[66] T EX. PENAL CODE §19.02(b)(3).

[67] Attempted or committed, and other than manslaughter or an offense included within manslaughter. S*ee Lawson v. State*, 64 S.W.3d 396, 397 (Tex. Crim. App. 2001); *Johnson v. State*, 4 S.W.3d 254, 255 (Tex. Crim. App. 1999).

[68] Attempted or committed.

[69] *Johnson,* 4 S.W.3d at 258.

[70] 208 S.W.3d at 468-69.

[71] *Id.* at 469 (quoting from *Jefferson v. State*, 189 S.W.3d 305, 313 (Tex. Crim. App. 2006)).

offenses that are not morally and conceptually equivalent.  He notes that, aside from the fact that different culpable mental states tend to signify different degrees of culpability, some of the culpable mental states in the injury-to-a-child statute result in different punishment ranges.  If bodily injury is inflicted upon a child "intentionally" or "knowingly," then the offense of "injury to a child" is a third degree felony, with a punishment range of two to ten years imprisonment.[72]  If bodily injury is inflicted upon a child "recklessly" or "with criminal negligence," then the offense of "injury to a child" is a state jail felony, with a punishment range of 180 days to two years in a state jail.[73]

A holding that no due process violation occurred because the underlying felonies were morally and conceptually equivalent is not the same as a holding that due process requires the underlying felonies to be morally and conceptually equivalent.  We did not have to decide in *White* whether due process requires moral and conceptual equivalence in that context.  We now hold that moral and conceptual equivalence is not required for underlying offenses in a felony murder prosecution under the current wording of the felony murder statute.

The "moral and conceptual equivalence" language in *White* was taken from *Jefferson v. State*.[74]  In *Jefferson*, we discussed Justice Scalia's suggestion in *Schad v. Arizona*[75] that due process would not permit the submission of alternative theories of criminal liability for novel "umbrella"

---

[72]T EX. PENAL CODE §22.04(f); *see also id.*, §12.34(a).

[73] *Id.*, §22.04(f), (g); *see also id.*, §12.35.

[74] 189 S.W.3d at 313.

[75] 501 U.S. 624 (1991).

crimes, such as a felony consisting of either robbery or the failure to file a tax return.[76] The concern seems to be that a legislature could conceivably decide to arbitrarily tie together two entirely unrelated crimes into a single statutory offense.

That concern is not present in felony murder cases. Justice Scalia discussed a situation in which an umbrella crime would contain wholly unrelated primary theories of liability. In contrast, an offense such as felony murder contains alternate underlying offenses that share a common nexus: all underlying felonies are related to dangerous conduct that causes the death of an individual. Causing the death of an individual is the *sine qua non* of all homicide offenses, and we recently recognized in *Huffman v. State* that "[w]ith respect to homicide offenses . . . different legal theories involving the same victim are simply alternate methods of committing the same offense."[77] And in the closely analogous capital murder context, we have long held that different underlying felonies may be charged in the disjunctive without violating the right to jury unanimity.[78]

When the offense of felony murder is viewed as a whole, as a homicide offense, "equivalence could reasonably be found"[79] with respect to any of the variations of committing that homicide

---

[76] *Jefferson*, 189 S.W.2d at 313-14 (discussing *Schad*, 501 U.S. at 650 (Scalia, J., concurring)).

[77] 267 S.W.3d 902, 905 (Tex. Crim. App. 2008).

[78] *Id.* (citing *Kitchens v. State*, 823 S.W.2d 256, 257 (Tex. Crim. App. 1991)).

[79] *See Schad*, 501 U.S. at 644 (plurality op.) ("Whether or not everyone would agree that the mental state that precipitates death in the course of robbery is the moral equivalent of premeditation, it is clear that such equivalence could reasonably be found, which is enough to rule out the argument that this moral disparity bars treating them as alternative means to satisfy the mental element of a single offense.").

offense. The point of the felony murder statute is to punish, as murder, a killing occurring during the course of a serious crime, the exact seriousness of the underlying crime not being a particular concern, so long as it is serious enough to be considered a "felony." That conclusion is reinforced by our holding in *Lomax v. State* that the underlying felony does not even have to supply a culpable mental state for the murder.[80]

Moreover, application of a "moral equivalence" rule to alternative underlying offenses is inappropriate where, as in the injury-to-a-child-context at issue here, the underlying offenses are in fact greater and lesser-included offenses. An offense is a lesser-included offense if "it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission."[81] Proof of one of the four culpable mental states recognized in Chapter 6 of the Penal Code necessarily suffices to prove any lesser culpable mental state recognized in that chapter.[82] A juror who believes that the greatest of the underlying offenses has been committed also believes that the least of the underlying offenses has been committed, so there is no actual divergence between the jurors with respect to the underlying offense. Here, that means that the jury was unanimous at least as to the culpable mental state of criminal negligence.

### III. DISPOSITION

---

[80] 233 S.W.3d 302, 307 (Tex. Crim. App. 2007) (felony DWI can qualify as an underlying felony in a felony murder prosecution).

[81] T EX. CODE CRIM. PROC. art. 37.09(3).

[82] *Wasylina v. State*, 275 S.W.3d 908, 910 (Tex. Crim. App. 2009); TEX. PENAL CODE §6.02(e); *see also id.*, §6.02(d)(ranking, from highest to lowest, the culpable mental states of intentional, knowing, reckless, and criminal negligence).

We sustain appellant's second ground for review, involving his article 38.23 instruction claims, to the extent that it complains about the absence of an article 38.23 instruction regarding a threat to jail his wife. We overrule his second ground in all other respects, and we overrule appellant's third ground for review, involving the jury-unanimity claim. The judgment of the court of appeals is reversed, and the case is remanded for a harm analysis.

Delivered: June 9, 2010
Publish