COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| SAUL CONTRERAS, | § | No. 08-06-00205-CR |
| Appellant, | § | Appeal from |
| v. | § | 346th District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC # 20060D02859) |
|  | § |  |

## O P I N I O N

Saul Contreras appeals his conviction of felony murder. A jury found Appellant not guilty of capital murder as alleged in Count I of the indictment but found him guilty of felony murder as alleged in Count II. The jury assessed his punishment at imprisonment for a term of ninety-nine years. On January 8, 2009, we affirmed Appellant's conviction. *Contreras v. State*, No. 08-06-00205-CR, 2009 WL 50601 (Tex.App.--El Paso January 8, 2009). The Court of Criminal Appeals granted Appellant's petition for discretionary review to address several issues including whether we erred by finding that Appellant was not entitled to an Article 38.23[1] instruction on the voluntariness of his confession. *Contreras v. State*, 312 S.W.3d 566, 576-77 (Tex.Crim.App. 2010). The Court of Criminal Appeals reversed because it found that the evidence raised a fact issue regarding whether the police threatened to arrest Appellant's wife if he did not confess and whether the threat rendered Appellant's confession involuntary. *Id.* The Court remanded the case for a harm analysis. *Id.* at 585-86.

---

[1] TEX.CODE CRIM.PROC.ANN. art. 38.23 (Vernon 2005).

# FACTUAL SUMMARY

At the time of the incident leading to Appellant's indictment and conviction, Appellant resided with his wife, Claudia, their two children, Claudia's sister Susana Hernandez, and Susana's five children, including 22-month-old, Jazmine. Susana and her children were living with Appellant's family because Susana and her husband were separated.[2] On Friday, November 28, 2003, Susana and Claudia got up early and left the children with Appellant for a few hours while they went to the after-Thanksgiving sales. They returned to the house around 10 a.m., but Susana left again around 2 that afternoon to buy cake and balloons for her son's birthday celebration. The children stayed home with Appellant and Claudia. Susana returned in about an hour and they celebrated her son's birthday by eating cake. Afterwards, Susana and Claudia began getting the children ready to go to Chuck E. Cheese. Susana bathed three of her children, including Jazmine, and got them dressed. Appellant did not want to go so he volunteered to stay home and watch Jazmine and Susana's youngest child, Delilah. Susana, Claudia, and the children left for Chuck E. Cheese at around 6 p.m. When they returned at 9:30 that evening, Appellant told Susana that Jazmine had fallen off of the couch, but he had checked her head and did not find any bumps. Jazmine had eaten earlier that day and had some diarrhea, but she did not have any physical injuries when they left her with Appellant at 6 p.m. Susana went into the bedroom and briefly checked on Jazmine at around 10 p.m. but she did not attempt to awaken her. About an hour later, Susana was putting the other children to bed when she noticed that Jazmine was stiff, pale white, cold, and not breathing. Susana ran out of the room and called 9-1-1. Appellant began CPR on Jazmine while they waited for emergency services to arrive. The paramedics found Jazmine to be "very cold," pale, not breathing, and without a pulse. They also saw bruises on Jazmine's stomach. Jazmine was

---

[2] Susana was married to Appellant's brother, Victor Contreras.

transported by ambulance to a hospital but she was pronounced dead. Hospital personnel told Susana that Jazmine had not been breathing for hours.

Dr. Juan Contin performed an autopsy and found evidence of blunt-force trauma to Jazmine's abdomen which caused massive internal injuries. Dr. Contin could not determine whether the injuries had been caused by a single blow or multiple blows but the force used was enough to transect the organs against the spine. He found a tear of the small bowel mesentery and a large contusion of the small and large bowel mesentery which would have incapacitated Jazmine immediately. These injuries would have caused tremendous pain and would have prevented her from walking or eating. Jazmine also suffered bruising to both sides of her diaphragm, pericardial sac, and lower lobes of her lungs. Like the injuries to the small and large bowel mesentery, these injuries would have immediately incapacitated Jazmine. Further, the injuries would have caused Jazmine to go into shock and she would have survived only fifteen minutes to a maximum of one hour after suffering them. In Dr. Contin's opinion, Jazmine's injuries could not have been caused by a fall from a couch. Based on the temperature of the body[3] and rigor mortis in the jaw, it was Dr. Contin's opinion that Jazmine had been dead for a few hours by the time emergency services arrived at the house that evening.

During the early morning hours of November 29, 2003, Detective Jimmy Aguirre began investigating Jazmine's death by taking statements from all adults who had been taking care of her the previous day. Appellant agreed to go with Aguirre to the police station to give his statement. After being advised of his *Miranda* rights, Appellant waived his rights and provided a lengthy written statement. Consistent with what he had told Susana, Appellant stated he was watching a basketball game while Jazmine was asleep on a couch. He heard what he described as a loud bang

---

[3] The child's body temperature was 80 degrees when the paramedics arrived at 11:15 p.m. that evening.

or a loud thump and then Jazmine began crying. He found her on the floor by the couch and checked her for injuries but found none. Appellant changed her diaper and clothes and sat with her on his bed for a while before putting her to bed. Appellant checked on Jazmine one time before the family returned home and he found her sleeping. After Susana returned from Jazmine's room and told him that Jazmine was not moving, Appellant attempted to perform CPR.

After Detective Aguirre received the autopsy findings, he knew that Appellant's statement was inconsistent with the child's injuries. Aguirre called Appellant and asked if he would meet with him again. Appellant agreed and he returned to the police station along with Claudia, Susana, and Victor Contreras. Aguirre escorted Appellant to an interview room and advised him of his *Miranda* rights. Appellant waived his rights and Aguirre went over the autopsy findings with Appellant. Appellant provided a written statement admitting that he had punched Jazmine in the abdomen. Appellant had become angry because she would not stop crying and she kept kicking while he was trying to change her diaper. He punched her four times in the stomach with his right fist until she "finally calmed down". He finished putting on her diaper and changed her clothes because they were all wet. Appellant said that Jazmine kept moaning and staring at him as though she were in shock. Appellant put Jazmine to bed and went back downstairs to watch the game. When the family returned, Appellant told Susana that Jazmine had fallen off the couch.

Appellant claimed that, during his second interview, he tried to maintain his story that Jazmine had fallen off of the couch. The detectives, however, told him that if he did not confess, his wife would be arrested and Child Protective Services would take their children away. Detective Aguirre denied making these threats. Appellant claimed that the officers' tactics caused him to confess even though he was innocent.

Dr. Karen Greist, a pediatric forensic pathologist, testified on behalf of the defense. She

agreed, based on her review of the evidence, that it was possible the child had died within fifteen minutes after being struck but she could not state this fact with certainty. Dr. Greist was aware of documented cases where a child lived up to three days with similar injuries. In such cases, the child could still be hungry and eat. According to Dr. Greist, the time of death for a child could not be accurately determined from body temperature or rigor. She testified that Jazmine's injuries could have been inflicted as little as one hour before the paramedics arrived or up to three days before Jazmine's death. On cross-examination, she admitted that she had performed only forty-eight to sixty autopsies since 1988. The State recalled Dr. Contin who testified that it would have been impossible for Jazmine to have been walking and eating after receiving the injuries she suffered because the injuries were "massive" and would have caused her death within fifteen minutes to one hour.

## HARM ANALYSIS

Texas law allows for jury instructions on three different types of "voluntariness" issues: (1) a general instruction on voluntariness under Article 38.22, § 6[4]; (2) a warnings instruction under Article 38.22, § 7[5]; and (3) a specific voluntariness instruction for constitutional due process claims under Article 38.23.[6] *Contreras*, 312 S.W.3d 566, 573 (Tex.Crim.App. 2010); *Oursborn v. State*, 259 S.W.3d 159, 173-74 (Tex.Crim.App. 2008). The trial court's charge included a single voluntariness instruction which addressed the first two types, but the court refused Appellant's request for a specific Article 38.23 instruction. The issue we must address on appeal is whether the court's failure to give the specific Article 38.23 instruction resulted in some harm to Appellant.

[4] TEX.CODE CRIM.PROC.ANN. art. 38.22, § 6 (2005).

[5] TEX.CODE CRIM.PROC.ANN. art. 38.22, § 7 (2005).

[6] TEX.CODE CRIM.PROC.ANN. art. 38.23 (2005).

When the defendant objects to an error in the charge, reversal is required only if the error was "calculated to injure the rights of defendant." TEX.CODE CRIM.PROC.ANN. art. 36.19 (Vernon 2006); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984)(op. on reh'g), *superseded on other grounds by rule as stated in Rodriguez v. State*, 758 S.W.2d 787 (Tex.Crim.App. 1988). This means that there must be "some harm" to the defendant from the error. *Sakil v. State*, 287 S.W.3d 23, 25-26 (Tex.Crim.App. 2009); *Almanza*, 686 S.W.2d at 171. Under this standard, any harm, regardless of degree, is sufficient to require reversal. *Druery v. State*, 225 S.W.3d 491, 504 (Tex.Crim.App. 2007). The actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and the weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole. *Sanchez v. State*, --- S.W.3d ----, 2010 WL 3894640 at *9 (Tex.Crim.App. 2010); *Almanza*, 686 S.W.2d at 171. Under the *Almanza* standard, the record must show that a defendant has suffered actual, rather than merely theoretical, harm from jury instruction error. *Warner v. State*, 245 S.W.3d 458, 464 (Tex.Crim.App. 2008); *Ngo v. State*, 175 S.W.3d 738, 750 (Tex.Crim.App. 2005).

Appellant's defense included an attack on the voluntariness of his second statement. Richard Ofshe, a professor at the University of California at Berkeley, testified as an expert witness on the subject of police interrogation tactics and influence. In particular, he testified about the significance of certain tactics and explained how they can be psychologically coercive. Further, Dr. Ofshe related to the jury that false confessions do occur and people sometimes confess to a crime they did not commit.

The trial court's charge included the following voluntariness instruction:

The Court has admitted into evidence before you the alleged written statement of the Defendant, and you are instructed that before you may consider the same for any purpose you must first believe from the evidence beyond a reasonable doubt that the

same was freely and voluntarily made by the Defendant *without compulsion or persuasion* and signed by him; and that prior thereto the Defendant had been warned by the person to whom the statement was made that:

(1) he had the right to remain silent and not make any statement at all and that any statement he made may be used against him at trial; and

(2) any statement he made may be used as evidence against him in court; and

(3) he had the right to have a lawyer present to advise him prior to and during any questioning; and

(4) if he was unable to employ a lawyer, he had the right to have a lawyer appointed to advise him prior to and during any questioning; and

(5) he had the right to terminate the interview at any time;

and that the Defendant prior to and during the making of the statement, knowingly, intelligently and voluntarily waived these rights; but if you do not so believe, or if you have a reasonable doubt thereof, then the alleged statement is entirely withdrawn from your consideration and you shall not give the same any force of effect whatever or consider it as any evidence of the Defendant's guilt in this case, and you shall not consider any evidence obtained as a result thereof, if any. [Emphasis added].

Defense counsel utilized this instruction to argue at length that the jury should disregard the second statement because it was not voluntary and it had been coerced by the detectives' purported threat to arrest Appellant's wife if he did not confess.

Appellant contends that he was harmed by the charge error because the voluntariness instruction given was limited to an inquiry into whether the *Miranda* warnings had been given. We do not read the instruction so narrowly. The instruction plainly asked the jury to determine whether it believed from the evidence beyond a reasonable doubt that the statement was freely and voluntarily made by the Defendant *without compulsion or persuasion*, and if it did not so believe or it had a reasonable doubt, the jury was instructed to not consider it as evidence in the case. The instruction also addressed whether Appellant had been provided the *Miranda* warnings, but it did not limit the

jury's consideration of voluntariness to that specific issue. The parties certainly did not understand the jury to be limited to the warnings issue in that the prosecutors and defense counsel spent considerable time during closing argument addressing the voluntariness of Appellant's second statement. We conclude that Appellant was not harmed by the charge error because the general voluntariness instruction gave the jury a mechanism by which it could disregard the second statement if it believed Appellant's claim of coercion based on the alleged threats to jail his wife. By finding Appellant guilty, the jury either rejected Appellant's claim of coercion and considered the second statement along with all of the other evidence, or it disregarded Appellant's second statement and found him guilty based on the remaining evidence. Because the record does not support a finding of some harm, we overrule the issue on remand and affirm the judgment of the trial court.

June 22, 2011

ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Rivera, JJ.

(Do Not Publish)