NUMBER 13-09-00027-CR

 

COURT OF APPEALS

 

THIRTEENTH DISTRICT
OF TEXAS

 

CORPUS CHRISTI – EDINBURG

                                                                                                                             

 

CECILIO MENDOZA,                                                                    Appellant,

 

v.

 

THE STATE OF TEXAS,                                                               
Appellee.

                                                                                                                             

 

On appeal from the 357th District Court

of Cameron County, Texas.

                                                                                                                             

 

MEMORANDUM OPINION

 

Before Justices
Garza, Vela, and Perkes

Memorandum Opinion by
Justice Garza 

 

            A jury convicted
appellant, Cecilio Mendoza, of attempted capital murder and burglary of a
habitation with intent to commit robbery, and sentenced him to forty-seven
years’ imprisonment on the attempted capital murder offense and fifteen years’
imprisonment on the burglary of a habitation offense, to be served
concurrently.  See Tex. Penal
Code Ann. §§ 15.01 (West 2003),
19.03(a)(2) (West Supp. 2010),
30.02(a)(1), (d) (West
2003).  By eight issues, appellant challenges:  (1) the sufficiency of the
evidence to support his conviction for attempted capital murder (issues one and
two); (2) the trial court’s refusal to submit an instruction on the
lesser-included offense of manslaughter (issue three); (3) the admission of his
two statements on grounds they were involuntary (issues four and five); (4) the
trial court’s refusal to instruct the jury on the voluntariness of his two
statements (issue six); (5) the trial court’s failure to make findings of fact
and conclusions of law regarding the voluntariness of his two statements (issue
seven); and (6) the admission of a “3D” exhibit and accompanying testimony of a
police officer (issue eight).  We affirm.

I.  Background

            In the early morning
hours of February 26, 2007, appellant and an acquaintance, Jose Limon, wearing
ski masks and carrying guns, entered the home of the Vallejo family in
Brownsville, Texas.  One of the family members escaped and called 911.  Police
officers arrived, entered the house, and a shootout ensued.  Limon died at the
scene.  Officer Rolando Trujillo suffered multiple injuries, but survived.  Appellant
attempted to escape by jumping through a window, but the police apprehended him
nearby.  Appellant gave two statements to the police:  (1) the first taken the
day following the incident, at the hospital, where he was receiving treatment for
his injuries; and (2) the second, taken four days later on March 2, 2007.

II. 
Voluntariness Issues

            We first
address appellant’s issues concerning the admissibility of his two written statements.

A.  Trial Court’s
Findings of Fact and Conclusions of Law

            By his seventh issue, appellant contends
the trial court erred in failing to make findings of fact and conclusions of
law regarding the voluntariness of his two statements, as required by article
38.22, section six of the code of criminal procedure.  See Tex. Code Crim. Proc. Ann. art. 38.22, § 6 (West 2005).  In response to this
issue, we abated this cause for compliance with section six of article 38.22.  See
id.; Urias v. State, 155 S.W.3d 141, 142 (Tex. Crim. App. 2004) (en
banc) (“The proper procedure is that the trial judge be directed to make the
required written findings of fact and conclusions of law.”).  Pursuant to our
request, the trial court submitted findings of fact and conclusions of law, and
such findings and conclusions have been timely filed with this Court.  Accordingly,
appellant’s seventh issue is overruled as moot.

B.  Voluntariness of Statements 

            By his fourth issue,
appellant contends that his first statement—taken at the hospital on the
afternoon following the incident—was involuntary because he was (a) intoxicated
due to his use of crack cocaine before the robbery and (b) “suffering from the
pain and effects of a gunshot wound.”  By his fifth issue, he contends that his
second statement was involuntary because he “did not fully understand the
rights he was abandoning” and “did not want to give another statement.”

1.  Standard of Review and Applicable
Law

            Whether a confession is
voluntary is a mixed question of law and fact.  Garcia v. State, 15
S.W.3d 533, 535 (Tex. Crim. App. 2000); see Crenshaw v. State, No.
01-09-791-CR, 2011 Tex. App. LEXIS 665, at *32 (Tex. App.–Houston [1st Dist.]
Jan. 27, 2011, no pet.) (mem. op., not designated for publication).  We give
great deference to the trial court's determinations of historical fact
supported by the record, especially when those findings are based on an evaluation
of credibility and demeanor of the witnesses.  Guzman v. State, 955
S.W.2d 85, 89 (Tex. Crim. App. 1997).  We afford the same amount of deference
to trial court rulings on mixed questions of law and fact when the resolution
of those ultimate issues turns on an evaluation of credibility and demeanor.  Id.
 However, we review de novo mixed questions of law and fact that do not fit
within that category.  Id.

            A confession is
involuntary or coerced if the totality of the circumstances demonstrates that
the confessor did not make the decision to confess of his own free will.  See
Delao v. State, 235 S.W.3d 235, 239 (Tex. Crim. App. 2007) (citing Arizona
v. Fulminante, 499 U.S. 279, 285-86 (1991)); Martinez v. State, No.
13-00-227-CR, 2001 Tex. App. LEXIS 4699, at *14 (Tex. App.–Corpus Christi July
12, 2001, pet. ref’d).  The court of criminal appeals has explained:

Under Article 38.21, “A statement of
an accused may be used in evidence against him if it appears that the same was
freely and voluntarily made without compulsion or persuasion[.]”  A defendant
may claim that his statement was not freely and voluntarily made and thus may
not be used as evidence against him under several different theories:  (1)
Article 38.22, § 6—general voluntariness; (2) Miranda v. Arizona as
expanded in Article 38.22, §§ 2 and 3 (the Texas confession statute); or (3)
the Due Process Clause.  It may be involuntary under one, two, or all three
theories.  A statement that is “involuntary” as a matter of constitutional law
is also “involuntary” under Article 38.22, but the converse need not be true.  The
theory of involuntariness determines whether and what type of an instruction
may be appropriate.  Thus, the first step in deciding upon an appropriate jury
instruction is identifying the theory of involuntariness.

 

Oursbourn v. State, 259 S.W.3d 159, 169 (Tex. Crim. App.
2008) (footnotes omitted).  The court has also held that although “youth,
intoxication, mental retardation, and other disabilities are usually not
enough, by themselves, to render a statement inadmissible under [a]rticle
38.22, they are factors that a jury, armed with a proper instruction, is
entitled to consider.”  Id. at 173.

2.  Trial Court’s Findings of Fact and
Conclusions of Law

            The trial court submitted
the following findings and conclusions:

FINDINGS OF
FACT

1.           
Defendant Cecilio
Mendoza was charged with attempted capital murder and burglary of a habitation
with intent to commit robbery, a felony.

 

2.           
Prior to the
incident in question, Defendant admitted to using narcotics.

 

3.           
Defendant was
involved in a firefight with officers from the Brownsville Police Department.

 

4.           
One of those
officers, Officer Rolando Trujillo, was wounded by a round fired from the
Defendant’s gun.

 

5.           
Defendant was
wounded by return fire from Trujillo’s duty weapon, as well as by jumping
through a glass window in an attempt to escape.

 

6.           
Defendant was
immediately taken to the hospital upon his apprehension.

 

7.           
Defendant was
given his Miranda rights at the hospital.

 

8.           
Hospital staff
informed the investigating Officer Thomas Clipper that Defendant was capable of
making a statement.

 

9.           
No medical expert
testified for the defense as to the Defendant’s purported intoxication either
before or during the taking of the first statement.

 

10.        
Defendant made a
second, written statement to the police on March 2, 2007.

 

11.        
The second
statement was made after a valid, written waiver of Miranda rights was
signed by Defendant.

 

12.        
Defendant has not
made a challenge to his second statement’s voluntariness, except to say that he
felt “burned” by giving the first statement and so made the second one.

 

CONCLUSIONS OF LAW

 

1.           
Defendant’s first
statement was voluntarily given.

 

2.           
Injury and
intoxication are, without some other evidence suggestive of a lack of
voluntariness, insufficient as a matter of law to declare a statement
involuntary.

 

3.           
No evidence
supports Defendant’s theory that he was so intoxicated and/or medicated for his
injuries that he was not aware of his rights.

 

4.           
Defendant waived
his rights before giving his first statement.

 

5.           
Defendant’s first
statement was not the product of an overborne will.

 

6.           
The treating nurse
informed the officers that Defendant was lucid; the only evidence before this
Court, then, is that Defendant’s waiver of rights was knowing, intelligent, and
his statement voluntary.

 

7.           
Defendant made no
challenge to the voluntariness of his second statement except to say that it
flowed as a natural consequence from the first.

 

8.           
Defendant did not
allege that his second waiver of rights was the product of an overborne will or
coercion.

 

9.           
Defendant
introduced no evidence to rebut the presumption of voluntariness that arises
from a valid, written waiver of rights under Texas Code of Criminal Procedure
Art. 38.22.

 

10.        
Defendant has
presented no new factual information upon which to base an objection to the
voluntariness of his second statement.

 

11.        
Defendant’s second
statement was voluntarily given.

 

12.        
Defendant has
failed to meet his burden to persuade this Court that either of his statements
should be suppressed.

 

13.        
Both of the
statements were properly admitted during Defendant’s trial.

 

3.  Discussion

a.  Appellant’s
First Statement

            Appellant argues—without
citation to the record—that he “was under the influence of at least crack
cocaine at the time of his first confession and was therefore intoxicated.”  The
evidence regarding appellant’s use of cocaine prior to the robbery was introduced
during the cross-examination of Detective Thomas Clipper, the officer who interviewed
appellant at the hospital and took his first statement.  Detective Clipper
testified that, pursuant to his investigation, sometime after he took
appellant’s first statement, appellant told him that prior to the events
leading up to the robbery, he had been at home and was using crack cocaine.  Detective
Clipper testified that before he interviewed appellant at the hospital, he
asked appellant’s attending nurse (1) whether appellant was sufficiently alert
and responsive to give a statement and (2) whether appellant was taking any
medication that could make him drowsy or impair his understanding.  Detective
Clipper was told appellant was able to give a statement.  Appellant was given Miranda
warnings prior to his statement and signed a written waiver of his rights. 
On cross-examination, Detective Clipper admitted he did not ask the nurse
whether appellant was intoxicated or had been drinking any alcohol.  Detective
Clipper testified that appellant was not impaired when he waived his rights and
provided the statement.

            We agree with the trial
court that appellant voluntarily waived his rights and voluntarily gave his
first statement.  We overrule appellant’s fourth issue.

b.  Appellant’s Second Statement

            Appellant contends that
his second statement was involuntary.  Again, without citation to the record,
appellant asserts that “[t]he [r]ecord reveals that once Appellant understood
that he was being required to give a second confession[,] he immediately
exclaimed that he had already given a statement; indicating he did not want to
give another statement.”

            At the beginning of
appellant’s second statement, Detective Marian Culver stated that she,
Detective Clipper, and appellant were present.[1] 
After Detective Culver read appellant his rights and appellant affirmed that he
understood and waived his rights, Detective Culver asked, “Now, do you want to
provide a statement to myself and Detective Clipper?”  Appellant responded, “I
already had gave [sic] a statement.”  Detective Culver said, “It’s your
decision.”  The interview then continued; appellant did not at any time assert
or suggest that he did not want to continue the interview.

            Appellant’s counsel
objected to the admission of his second statement as follows:

[Defense counsel]:  Your Honor, we
would object as [to] the voluntariness of this.  Previously when [appellant] gave
his statement he had already given one statement when he was, I believe, had
cocaine and alcohol in his system.  He was already, you know, felt like he was
already burned and that’s why he executed this one; therefore, we will go ahead
and object to the entry of this one. 

 

            We disagree that the
record shows that appellant “did not want to give another statement.”  Instead,
the record reflects that appellant understood and waived his rights and
voluntarily gave the second statement.  The trial court did not err in
admitting the second statement.  We overrule appellant’s fifth issue.

C.  Voluntariness Instruction

            By his sixth issue,
appellant contends the trial court erred in denying his request for an
instruction on the issue of the voluntariness of his two statements.  Appellant
argues that he raised the voluntariness of his statements as an issue, and that
the issue should have been submitted to the jury.  The State responds that: 
(1) the trial court did not err in refusing a voluntariness instruction because
the issue was not properly raised; and (2) appellant has not shown that he was
harmed by the trial court’s refusal to give the instruction, and any error,
therefore, is harmless.

1.  First Statement 

a.  Requested
Instruction

            At the charge conference, appellant’s
counsel offered a proposed jury instruction regarding the voluntariness of
appellant’s first statement:

[Appellant’s counsel]:         The [defense’s]
second [requested instruction], Your Honor, is regarding the first confession,
Your Honor.  We’re asking, and we have provided defense proposed jury
instruction No. 2, and it states, “You are instructed that under the law, under
our law, a statement or confession of the defendant made while he is in custody
of the officer shall be admitted into evidence if it appears that same was
freely and voluntarily made without compulsion or persuasion.”

 

                                                “Now,
if you find from the evidence, or if you have a reasonable doubt thereof that
at the time of the statement of the defendant in this case, if such statement
was, there was a Detective Clipper, the defendant was under the influence of—”
we, I think insert here crack cocaine—“to such extent as to be reduced to a condition
of mental impairment such as to render the statement not wholly, not wholly
voluntarily [sic], then such statement would not be freely and voluntarily
made, and in such case you will wholly disregard the alleged written statement
referred to and not consider it for any purpose.”

 

            Counsel referred the trial
court to:  (1) Detective Clipper’s testimony that appellant had been smoking
crack cocaine before he was arrested; and (2) testimony that appellant was
suffering from an untreated gunshot wound, had not been given medication, and
therefore, would have been in pain at the time he was interviewed.[2]       Although
counsel did not specifically cite section six of article 38.22, the language of
appellant’s proposed instruction is a paraphrase of the instruction provided
for in section six of article 38.22.  See Tex. Code Crim. Proc. Ann. art. 38.22, § 6; Vasquez v. State, 225
S.W.3d 541, 543-44 (Tex. Crim. App. 2007) (holding that although appellant did
not cite a specific statute as basis for his request, he paraphrased the
statutory language provided in article 38.22, section six, and therefore
preserved issue as to trial court’s denial of instruction).  Thus, we conclude
that appellant requested a “general” voluntariness instruction under article
38.22, section six.  See Oursbourn, 259 S.W.3d at 181 (holding evidence
that appellant was bipolar and in a depressed or manic state raised a “general”
voluntariness question under article 38.22, section six, a statutory claim
focusing on appellant’s subjective mental state).

b.  Discussion

            As noted, claims of youth,
intoxication, and mental retardation, by themselves, are rarely sufficient to
render a statement inadmissible; however, a jury, armed with a proper jury instruction,
may consider these factors.  See id.  Entitlement to an instruction
under article 38.22, section six does not require a factual dispute.  See
id. at 176.  Even if evidence is undisputed that a defendant was “high” on
narcotics at the time he gave his statement, “if a reasonable jury could find
that the facts, disputed or undisputed, rendered [a defendant] unable to make a
voluntary statement, he is entitled to a general voluntariness instruction when
he raised a question of the voluntariness of his statement.”  See id.

            Here, appellant’s counsel pointed to
evidence that appellant had been smoking crack cocaine prior to the robbery and
had suffered an untreated gunshot wound.  We conclude that this evidence raised
a general voluntariness question under article 38.22, section six, and the
issue of the voluntariness of appellant’s first statement should have been
submitted to the jury.  See id. at 181; Moore v. State, No.
14-07-00366-CR, 2008 Tex. App. LEXIS 7052, at *16 (Tex. App.–Houston [14th
Dist.] Aug. 28, 2008, pet. ref’d) (mem. op., not designated for publication) (finding
evidence that appellant was under influence of narcotics when interviewed, even
though investigator did not observe signs of intoxication, raised a general
voluntariness question, and issue of voluntariness should have been submitted
to the jury under article 38.22, section six).

c.  Harm
Analysis

            In evaluating alleged
jury-charge error, we first determine whether error occurred and then determine
whether the error caused sufficient harm to warrant reversal of the conviction.
 Abdnor v. State, 871 S.W.2d 726, 731-32 (Tex. Crim. App. 1994) (en
banc).  In cases where the defendant timely objected to the charge error, we
reverse the conviction if the defendant suffered some actual harm as a result
of the error.  Id. at 732; Almanza v. State, 686 S.W.2d 157, 171
(Tex. Crim. App. 1985) (op. on reh'g).  In evaluating whether the defendant
suffered some actual harm, we consider the entire jury charge as given, the
evidence, counsels’ arguments, and any other relevant information in the
record.  Almanza, 686 S.W.2d at 171.

            We first note that in his
brief, appellant does not address whether or how he was harmed by the trial
court’s refusal to provide a voluntariness instruction as to his first
statement.  Nonetheless, we conclude he cannot show he was harmed because
evidence of his guilt, other than the confession in his first statement, was
overwhelming.  Officer Trujillo, the first police officer to confront appellant
and Limon as the robbery was in progress, testified that when he stepped into
the doorway, he saw appellant holding a .357 Magnum revolver to a woman’s
head.  Officer Trujillo testified that appellant fired three shots from the
revolver in his direction.  According to Officer Trujillo, he heard the shots, saw
the “muzzle flash” from the revolver, and “felt something hit [him] in the
knee.”  The .357 revolver was recovered in the bedroom where the shooting
occurred.  Three fired bullet casings were retrieved from the cylinder of the
revolver.  In light of the entire record, we hold that the trial court’s error
in refusing to include a general instruction as to the voluntariness of
appellant’s first statement did not cause appellant any harm and therefore does
not constitute reversible error.

2.  Second Statement 

            As to appellant’s second
statement, appellant’s counsel requested the following voluntariness
instruction:

And unless you believe from the
evidence beyond a reasonable doubt that the alleged confession or statement
introduced into evidence was freely and voluntarily made by the defendant
without compulsion or persuasion, or if you have a reasonable doubt thereof,
you should not consider such alleged statement or confession for any purpose
nor any evidence obtained—nor any evidence obtained as a result thereof. 

 

Appellant’s counsel argued to the
trial court that the voluntariness of the second statement was raised when appellant
commented at the beginning of the second interview “that he’d rather not give a
statement, that he had already given a statement and then there’s silence.” 
Counsel’s argument to the trial court suggested that the officers improperly continued
to interview appellant after he indicated that he did not want to give a
statement.  The trial court rejected counsel’s argument, and we conclude that
it did not err in doing so.  Appellant’s actual comment was, “I already had
gave a statement,” not that he would rather not give a statement.

            We have already determined
that the trial court did not err in admitting appellant’s second statement.  Article
38.23(a) states that:

No evidence obtained by an officer or
other person in violation of any provisions of the Constitution or laws of the
State of Texas, or of the Constitution or laws of the United States of America,
shall be admitted in evidence against the accused on the trial of any criminal
case.

 

In any case where the legal evidence
raises an issue hereunder, the jury shall be instructed that if it believes, or
has a reasonable doubt, that the evidence was obtained in violation of the
provisions of this Article, then and in such event, the jury shall disregard
any such evidence so obtained.

 

Tex. Code
Crim. Proc. Ann. art.
38.23(a) (West 2005); see Contreras v. State, 312 S.W.3d 566, 573-74
(Tex. Crim. App. 2010).  The court of criminal appeals has recently explained
when an article 38.23 instruction is required:

The trial court has a duty to give an
article 38.23 instruction sua sponte if three requirements are met:  (1)
evidence heard by the jury raises an issue of fact, (2) the evidence on that
fact is affirmatively contested, and (3) the contested factual issue is
material to the lawfulness of the challenged conduct in obtaining the statement
claimed to be involuntary.  A statement is obtained in violation of
constitutional due process only if the statement is causally related to
coercive government misconduct.  Coercive government misconduct renders a
confession involuntary if the defendant's “will has been overborne and his
capacity for self-determination critically impaired.”  Whether this has
occurred is determined by assessing the “totality of all the surrounding
circumstances,” including “the characteristics of the accused and the details
of the interrogation.”

 

Contreras, 312 S.W.3d at 574 (internal
citations omitted).

            Here, the evidence does
not raise a fact issue as to whether appellant requested to terminate the
second interview.  He did not even assert, as counsel suggested, that he did
not want to give a second statement.  He simply stated an undisputed fact: 
that he had already given a statement.

A police officer does not need to stop
questioning a suspect “unless the suspect’s invocation of rights is
unambiguous, and the officer is not required to clarify ambiguous remarks.”  Ramos
v. State, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008) (quoting Dowthitt
v. State, 931 S.W.2d 244, 257 (Tex. Crim. App. 1996)).  Appellant did not
invoke his right to terminate the interview—either ambiguously or
unambiguously.

We conclude that the trial court did not
err in refusing to submit a voluntariness
instruction as to appellant’s second statement.[3] 
We overrule appellant’s sixth issue.

III.  Sufficiency
of the Evidence

By his first and second issues,
appellant contends the evidence is legally and factually insufficient to
support his conviction for attempted capital murder.  Specifically, he contends
that the evidence is insufficient that he had the requisite intent to commit
murder.  We detail below relevant testimony presented by some of the State’s
witnesses.  The defense presented no witnesses.

A.  Standard of
Review 

The court of criminal
appeals has recently held that there is “no meaningful distinction between the Jackson
v. Virginia legal sufficiency standard and the Clewis factual-sufficiency
standard” and that the Jackson standard “is the only standard that a
reviewing court should apply in determining whether the evidence is sufficient
to support each element of a criminal offense that the State is required to
prove beyond a reasonable doubt.”  Brooks v. State, 323 S.W.3d 893,
902-03, 912 (Tex. 2010) (plurality op.).  Accordingly, we review claims of
evidentiary sufficiency under “a rigorous and proper application of the Jackson
standard of review.”  Id. at 906-07, 912.  

            Under the
Jackson standard, “the relevant question is whether, after viewing the
evidence in the light most favorable to the prosecution, any rational trier of
fact could have found the essential elements of the crime beyond a reasonable
doubt.”  Jackson v. Virginia, 443 U.S. 307, 319 (1979); see Brooks,
323 S.W.3d at 898-99 (characterizing the Jackson standard as: 
“Considering all of the evidence in the light most favorable to the verdict,
was a jury rationally justified in finding guilt beyond a reasonable doubt”).

            We
measure the legal sufficiency of the evidence by the elements of the offense as
defined by a hypothetically correct jury charge.  Coleman v. State, 131
S.W.3d 303, 314 (Tex. App.–Corpus Christi 2004, pet. ref’d) (citing Malik v.
State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).  In order to prove that
appellant committed the offense of attempted capital murder, as alleged in the
indictment, the State was required to prove that (1) appellant, (2) either
acting alone or as a party,[4]
(3) with specific intent to commit an offense (capital murder of Rolando
Trujillo, a peace officer who was acting in the lawful discharge of his
official duty and who appellant knew was a peace officer), (4) did an act
amounting to more than mere preparation (discharging a firearm at Trujillo), (5)
that tended but failed to effect the commission of the offense intended.  See
Tex.
Penal Code Ann. §§ 15.01 (listing
elements of criminal attempt); Yalch v. State, 743 S.W.2d 231, 233 (Tex.
Crim. App. 1988).[5]
 

            A person
commits capital murder if he commits murder as defined by section 19.02(b)(1)
of the penal code and he intentionally commits the murder in the course of
committing or attempting to commit robbery.  See Tex. Penal
Code Ann. § 19.03(a)(2). 
Attempted capital murder, as alleged in the indictment, is a “result of
conduct” offense.  Turner v. State, 805 S.W.2d 423, 430 (Tex. Crim. App.
1991).  A “result of conduct” offense means that the accused had to have a
particular mind set (i.e., intentional or knowing) to cause the prohibited
result.  Richie v. State, 149 S.W.3d 856, 857 (Tex. App.–Amarillo 2004,
no pet.).  “Not only must the accused be found to have intended to engage in
the act that caused the death, he also must have specifically intended that death
result from that conduct; the mere intent to pull the trigger of a firearm will
not satisfy the statute.”  Turner, 805 S.W.2d at 430.  The jury may
infer the requisite intent from any facts which tend to prove its existence,
including the acts, words, and conduct of the accused, and the method of
committing the crime and from the nature of the wounds inflicted on the
victims.  Yanez v. State, 187 S.W.3d 724, 742-43 n.13.

            As noted,
appellant challenges only the sufficiency of the evidence as to the intent
element:  that he intended to murder Officer Trujillo.

B.  The State’s Evidence

1.  Officer Rolando
Trujillo

Officer Trujillo
testified
that he responded to an emergency call regarding a home invasion in the early
morning hours of February 26, 2007.  As he approached the house, Officer
Trujillo said he heard voices inside the house saying that “they were going to
start shooting.”  Other officers arrived, and the officers lined up and entered
the house through an open sliding glass door at the rear of the house.  Once
inside the house, Officer Trujillo “took the lead” because he had more
experience than the younger officers.  The officers proceeded down the hallway
of the residence.  As the officers made their way down the hallway toward the
master bedroom where the residents were being held, Officer Trujillo observed
two men face down on the floor.  As the officers approached, Officer Trujillo saw
a female standing; he also saw an outstretched arm holding a revolver pointed
at the woman’s head.  Officer Trujillo stepped into the door frame and
announced, “Police.”  Officer Trujillo saw a second suspect (Limon) holding a
handgun.  Officer Trujillo heard one round fired, and he fired also.  According
to Officer Trujillo, appellant fired three times in the officer’s direction. 
Officer Trujillo felt pain in his hands and realized he had been shot.  He
stepped outside the bedroom, saw blood coming from his left hand, and saw a
finger dangling.  He also felt pain in his abdomen.  After composing himself,
Officer Trujillo went back into the bedroom and fired one round at Limon, who
was on the ground.  Officer Trujillo saw appellant move away; he saw the
revolver pointed at him and saw the muzzle flash from the revolver.  He then
felt something hit him in the knee and “started buckling down.”  As Officer
Trujillo was going down, he saw a second and third muzzle flash from the
revolver.  Evidence showed that there were three bullet holes in the bedroom
door that was behind Officer Trujillo.  Officer Trujillo testified that
appellant’s first shot hit him in the knee.  Officer Trujillo was injured in
both hands, the abdomen, and the knee.  After suffering these injuries, Officer
Trujillo dragged himself into a bedroom across the hall.  A second officer,
Officer John Paul Wright, went into the master bedroom.  A third officer,
Officer Raymond Rora, assisted Officer Trujillo.

Officer Trujillo
identified photographs of injuries that he suffered during the gunfight.  He described
the injury to his knee as a “slicing wound” across the kneecap, which is consistent
with a wound inflicted by a .357 Magnum, the weapon used by appellant.

2.  Officer Manuel
Lucio

Manuel Lucio, an
officer with the Brownsville Police Department, testified that three spent
bullet casings were recovered from the cylinder of a .357 Magnum found at the
crime scene.  

On cross-examination,
Officer Lucio testified that the .357 Magnum was found on the floor of the
master bedroom.  At the time it was recovered, the cylinder of the .357 Magnum
was open, which rendered the weapon inoperable; however, it had spent casings
inside the cylinder and several unfired rounds were found outside the weapon.

3.  Sergeant Kirk
Massey

Sergeant Kirk Massey
testified that he was one of the officers who entered the Vallejo residence. 
After the shooting started, Sergeant Massey went to the back of the house to
secure the area.  He heard the sound of a window glass breaking in the room
where the shooting occurred, and saw a figure jump from the window.  Sergeant
Massey fired at the suspect, later identified as appellant.

On cross-examination,
Sergeant Massey stated he did not know whether appellant was armed when he
jumped out the window, and did not know whether he hit appellant when he
fired.  

4.  Detective Cris
Ortiz

Detective Cris Ortiz
testified that he set up a perimeter and secured the area where appellant had
escaped.  Detective Ortiz apprehended and arrested appellant, who had suffered
a gunshot wound to his leg.  After appellant was taken to the hospital,
Detective Ortiz spoke to him and confirmed that he had waived his rights.  Appellant
agreed to allow Detective Ortiz to collect samples from appellant’s hands for
gun-residue testing.  Detective Ortiz collected the samples from appellant’s
hands. 

5.  Thomas Rusk White

Thomas White, a
forensic chemist with the Texas Department of Public Safety Crime Laboratory
Service, testified that he performed a gunshot-residue test on samples taken
from appellant’s hands the night of the robbery.  White testified that gunshot
residue was present in the samples taken from appellant’s hands.  According to
White, a person who had fired a .357 Magnum revolver three times would “more
than likely” have gunshot residue on his hands.

6.  Richard
Hitchcocks

            Richard Hitchcocks, a
forensic firearms and tool mark examiner for the Texas Department of Public
Safety Crime Laboratory in McAllen, Texas, testified regarding various firearms
retrieved from the crime scene, including the .357 Magnum used by appellant.  Hitchcocks
testified that, based on his examination of the .357 Magnum, it was impossible
to create an unintended discharge of the weapon; in other words, the weapon would
not fire unless the trigger was pulled.  Hitchcocks testified that the .357
Magnum could not discharge with the cylinder open, but if it were dropped or
thrown in such a manner that it struck a surface, the impact could cause the cylinder
to open.  However, he testified that it was not possible for the weapon to be
dropped and discharge three times.  Hitchcocks also testified that based on his
examination of three .357 Magnum caliber bullets recovered from the master
bedroom crime scene, those three bullets were fired from the .357 Magnum
revolver that appellant was using.  According to Hitchcocks, appellant’s .357
Magnum revolver was discharged a minimum of three times.  

7.  Detective Thomas Clipper and
Appellant’s Statements

Detective Clipper, a detective with
the Brownsville Police Department, testified that he was present when appellant
was apprehended and taken by EMS to the hospital for treatment.  Pursuant to
his assignment to investigate the incident, Detective Clipper spoke to the police
officers who assisted in stopping the robbery.  He was unable to interview Officer
Trujillo for several weeks due to Officer Trujillo’s injuries.  

A couple of hours after arriving at the
scene, Detective Clipper went to the hospital and spoke with appellant.  He
advised appellant of his rights, and appellant waived his rights.  Detective
Clipper’s initial conversation with appellant at the hospital was to learn the
identity of Limon, the deceased.  From this first conversation with appellant,
Detective Clipper learned the identity of the person who introduced appellant
to Limon.  After following several contacts, the police learned Limon’s
identity and that two other suspects—the two who dropped appellant and Limon
off at the house and remained in the car—were involved in the robbery.  Armed
with this information, Detective Clipper went to the hospital, read appellant
his rights a second time, and showed him photo lineups, from which appellant
identified the two individuals in the vehicle.

In the afternoon of the day after the
robbery, Detective Clipper went to the hospital a third time to interview
appellant.  Before conducting the interview, Detective Clipper asked permission
from appellant’s attending nurse and was told that appellant was alert and
responsive.[6] 
Detective Clipper also asked whether appellant was under the influence of any
medications that could impair him from giving a statement and was told that he was
not. 

After he advised appellant of his
rights and appellant waived his rights, Detective Clipper interviewed
appellant.  The jury was shown the videotaped interview.  Bearing in mind that
appellant has challenged only the sufficiency of the evidence that he had the
requisite intent, we focus only on those portions of the statement related to
that issue. 

Appellant stated that Limon gave him a
gun, the .357 Magnum revolver, to use in the robbery.  Appellant recognized
Officer Trujillo when he came into the bedroom because Officer Trujillo had
been involved with appellant as a juvenile in prior proceedings.  Appellant
stated, in relevant part: 

Q [Clipper]:          Okay.  So who
shot Officer Trujillo?

 

A [Appellant]:      Joe.

                        

Q:                          Joe shot
him?  How many times?

 

A:                          I think
like three times, and I got scared and I shot mine, too.

 

Q:                          How many
times?

 

A:                          Like two
or three times.

 

Q:                          Two or
three times?

 

A:                          I was
scared.

 

Q:                          The
revolver—

 

A:                          Yes, sir. 

 

Q:                          Did you
hit Officer Trujillo?

 

A:                          I’m not
sure.

 

Q:                          You’re not
sure?

 

A:                          No, sir.

 

Q:                          Okay.  And
then what did you do?

 

A:                          Then I
jumped out the window.

 

. . . .

 

Q:                          Okay, but
you’re saying Joe shot him three times, and you shot three times; but you were
scared.  So did you hit him?

 

A:                          I don’t
think so. 

 

            Detective Clipper
testified that he interviewed appellant the second time on March 2, 2007 at the
Brownsville Police Department.  Detective Clipper stated that he advised
appellant of his rights and appellant waived his rights.  He also stated that
appellant was not under the influence of any drugs or alcohol and did not at
any time ask to stop the interview.  An audio-recording of the interview was
played for the jury.[7] 
In the second statement, appellant provided conflicting statements as to what
occurred:

A [Appellant]:      And out of nowhere
I just heard, [“]Brownsville PD.[”]  And when I heard, [“]Brownsville PD.,[”] I
turned around, and when I turned around, Trujillo shot me in the leg.  And when
Trujillo shot me in the leg, so my friend Joe, he started shooting at
Trujillo.  And that’s the rest of the cops—

 

. . . . 

 

And then, pos,[[8]] I got scared.  I never aimed
at Trujillo.  I never shot my gun, but I remember I never shot my gun. 

 

. . . . 

 

So, when Trujillo, when Trujillo and
the rest of the cops started shooting at Joe, so I got scared and threw my gun,
jumped on top of the bed and went out the window.

 

Q [Culver]:           Did you fire a
gun at any time?

 

A:                          No, ma’am.

 

Q:                          And it
never went off?

 

A:                          Hu-uh.  It
might went off when I threw it to the floor.  I don’t know.  But I never fired
the gun.

 

Q:                          You never
pointed it at anybody?

 

A:                          Anybody.

 

Q:                          It never
went off?

 

A:                          It never went
off.

 

Q:                          Did you
pull the trigger?

 

A:                          No, ma’am.

 

Q:                          Intentionally
on purpose or accidental?

 

A:                          Maybe I
did.  I don’t remember.  I was scared.

 

Q.                          Okay.  So
do you think it went off, or you think it didn’t go off?

 

A:                          I think it
never went off, but I was scared.  When I got up, I think the gun went off.

 

Q [Clipper]:          When you got up,
what do you mean?

 

A:                          When I get
up to the bed, got off the floor, too.  When I got off the floor and jumped up
to the bed, I think the gun went off; but I never aimed [at] Trujillo for
nothing.

 

. . . .

 

Q:                          Do you
remember shooting at any time?

 

A:                          No, sir. 
Maybe I did, but I was scared, and everything was just out of my mind.

 

            Detective Clipper
testified that, based on all the evidence, he concluded that appellant fired
the .357 Magnum revolver three times.  On cross-examination, defense counsel
attempted to show that appellant may have intended to “warn” Trujillo to stop
firing.  Detective Culver responded:

So your question is if he [appellant]
fired a round to warn Officer Trujillo?  The indications on the door is no.  He
aimed at Officer Trujillo.  The only thing that saved Officer Trujillo’s life
is that his knee did buckle.  He went down.  Because if you see the holes in
the door, if he stood upright, Officer Trujillo would have been hit in the—at
least the torso area and the neck area.

 

            Appellant did not testify.

C.  Analysis

In his brief, appellant argues the evidence
is insufficient to support that he intended to murder Officer Trujillo by
shooting at him with a firearm, and points to the following:  (1) Officer
Trujillo admitted that he fired first; (2) Officer Trujillo’s statement does
not assert that appellant fired at him[9];
and (3) in his statements, appellant said he did not believe that he fired at
Officer Trujillo and did not know whether he had.

            A specific intent to kill
is a necessary element of attempted murder.  Flanagan v. State, 675
S.W.2d 734, 741 (Tex. Crim. App. 1984).  Intent may be inferred from
circumstantial evidence such as the acts, words, and conduct of the appellant.  Guevara
v. State, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).  Intent to kill may be
inferred from the use of a deadly weapon, unless it is reasonably apparent that
serious bodily injury or death could not result from the particular manner of
use.  Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996).  A
firearm is, per se, a deadly weapon.  Tex.
Penal Code Ann. § 1.07(a)(17)(A) (West 2010).

The jury heard evidence that the .357
Magnum revolver used by appellant was fired three times and could not have
discharged accidentally.  Although appellant gave conflicting statements as to
whether he fired or not, the jury could have believed his testimony that he shot
two or three times and disbelieved his testimony that he never fired the gun.  See
Davila v. State, 147 S.W.3d 572, 575 (Tex. App.–Corpus Christi 2004, pet.
ref’d) (noting that jurors are free to accept or reject any or all of
witnesses’ testimony).  

Viewing all the evidence in the light
most favorable to the verdict, we conclude the evidence is legally sufficient
for a rational jury to find appellant guilty of attempted capital murder.  We
overrule appellant’s first and second issues. 

IV.  Lesser-Included
Offense Instruction

By his third issue, appellant contends
the trial court erred by denying his request for an instruction on the
lesser-included offense of manslaughter.  

At trial, appellant’s counsel
requested the lesser-included-offense instruction as follows:

Obviously, this would be attempted
manslaughter, and we would keep the attempt definition as included in the
Court’s charge for purposes of the record.

 

The reason that we are asking for that
is during the interview of Mr. Cecilio Mendoza, I think this was the second
interview, Detective Culver asked him if he accidentally or he may have
accidentally shot at the Officer Trujillo.  And at that time he indicated that,
yes, he had.  He said that he was very scared and then he indicated that he may
have shot at the officer.  This was during the second interview, Your Honor.

 

We first note that although appellant
gave conflicting statements in the second interview, his counsel’s
characterization of those statements was somewhat misleading.  Appellant did
not say that he accidentally shot at Officer Trujillo; when asked if he
“[i]ntentionally” or “accidental[ly]” shot at Officer Trujillo, appellant said
“maybe” he did—without specifying whether “maybe” applied to intentionally or
to accidentally—but did not remember.

Nonetheless, appellant was charged
with, and convicted of, attempted capital murder.  A person commits an attempt
offense if “with specific intent to commit an offense, he does an act amounting
to more than mere preparation that tends but fails to effect the commission of
the offense intended.”  See Tex. Penal Code Ann. § 15.01(a). 
A person commits manslaughter if he recklessly causes the death of an
individual.  See id. § 19.04(a) (West 2003).  A person acts recklessly
when he is aware of but consciously disregards a substantial and unjustifiable
risk.  Id. § 6.03(c) (West 2003).

For a person to commit an offense
under section 15.01(a), the attempt statute, the person must have “the specific
intent to commit” the offense attempted.  The attempt statute does not apply
when the culpable mental state for the offense attempted is less than knowing. 
Gonzales v. State, 532 S.W.2d 343, 345 (Tex. Crim. App. 1976) (noting
that it is impossible to specifically intend to recklessly kill another); Strong
v. State, 87 S.W.3d 206, 217 (Tex. App.–Dallas 2002, pet. ref’d); Yandell
v. State, 46 S.W.3d 357, 361 (Tex. App.–Austin 2001, pet. ref’d); see
Townsend v. State, No. 11-05-219-CR, 2006 Tex. App. LEXIS 4929, at **4-5
(Tex. App.–Eastland June 8, 2006, pet. ref’d).  Here, appellant’s counsel
requested an instruction for “attempted manslaughter.”  Section 15.01(a) does
not apply to manslaughter, and the trial court did not err in refusing to give
the requested instruction.  Appellant’s third issue is overruled.

V.  Admission
of Evidence

By his eighth issue, appellant
contends that the trial court erred in admitting State’s Exhibits 547, 548,
549, 550, and 551.  The exhibits are DVDs which depict three-dimensional (“3D”)
computer-generated representations of the crime scene.  Appellant complains the
trial court erred in admitting (1) the 3D exhibits as scientific evidence and (2)
the testimony of Officer Julio Briones as expert testimony.  Officer Briones
created the exhibits by using a commercially-available computer software
program.[10]

The State responds that:  (1)
appellant failed to preserve the issue because his objection at trial differed
from his argument on appeal; (2) Officer Briones was not testifying as an
expert; and (3) the exhibits are demonstrative evidence, which is admissible if
it tends to aid the jury in resolving issues relevant to the case.

A.  Standard of Review and Applicable
Law 

            We will not disturb a
trial court's evidentiary ruling absent an abuse of discretion. Winegarner
v. State, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007).  As long as the trial
court's ruling is within the zone of reasonable disagreement and is correct
under any theory of law, it must be upheld.  Id.

B.  Discussion

Assuming, without deciding, that
appellant preserved this issue,[11]
we conclude that the trial court did not abuse its discretion in admitting the
3D exhibits.  

The trial court questioned the
prosecutor, “What are you—you utilizing him as an expert to testify about how
it was created?”  The State responded, “we can utilize [Officer Briones] as a
layperson.”  Officer Briones testified that he:  (1) was familiar with the
Crime Zone software used in this case; (2) had used the software on at least two
previous occasions and to create State’s Exhibit 546, a “flat” diagram of the
crime scene; (3) believed the diagrams were to scale; and (4) believed the
exhibits would assist the jury in determining what happened the night of the
crime.[12] 


The State argued to the trial court
that Officer Briones was “not testifying as an expert as to gunshot
trajectories” and that the exhibits were simply “demonstrative element[s].” 
The trial court observed that State’s Exhibit 546, which was also created by
Officer Briones using the same computer software and information, was already
admitted in evidence.  The court then overruled appellant’s counsel’s
objections and admitted the exhibits.[13]

Diagrams are generally admissible to
explain the testimony of a witness and render it more intelligible.  Holding
v. State, 460 S.W.2d 133, 135 (Tex. Crim. App. 1970); Mayfield v. State,
848 S.W.2d 816, 819 (Tex. App.–Corpus Christi 1993, pet. ref’d); see
Hartsock v. State, 322 S.W.3d 775, 778-79 (Tex. App.–Fort Worth 2010, no
pet.).  Moreover, even if the trial court erred in admitting the 3D
exhibits, the improper admission of evidence is harmless if the trial record
contains other, properly admitted evidence that is probative of the same
matter.  See Saldano v. State, 232 S.W.3d 77, 102 (Tex.Crim.App.2007).  Here,
as the trial court noted, State’s Exhibit 546 had been admitted and depicted
the same information without the 3D enhancement.  We overrule appellant’s
eighth issue.

VI.  Conclusion

We affirm the trial court’s judgment. 

DORI
CONTRERAS GARZA

                                                                                                Justice

 

Do
not Publish. 

Tex. R. App. P.
47.2(b)

Delivered and
filed the 

9th day of June,
2011.









[1]
Although appellant’s second statement was videotaped, the jury only heard the
audio recording.





[2]
As noted above, appellant was given Miranda warnings at the beginning of
each statement, and signed a written waiver of his rights as to each statement.






[3]
We note that in Contreras, the court of criminal appeals concluded:

 

Miranda or
article 38.22, not article 38.23, is the vehicle for excluding statements
obtained in violation of Miranda guidelines.  And because Miranda claims
do not fall within the ambit of article 38.23, a defendant is not entitled to a
jury instruction under that statute.  Article 38.22, not article 38.23, is the
appropriate vehicle for obtaining a jury instruction regarding a purported
violation of Miranda, to the extent such a vehicle is available. 

 

Contreras v. State, 312 S.W.3d 566, 583
(Tex. Crim. App. 2010).  Thus, appellant was not entitled to a voluntariness
instruction under either article 38.23 or 38.22.





[4]
Appellant was charged as a party.  See Tex.
Penal Code Ann. § 7.02(a)(2) (West 2003) (“A person is criminally
responsible for an offense committed by the conduct of another if . . . acting
with intent to promote or assist the commission of the offense, he solicits,
encourages, directs, aids, or attempts to aid the other person to commit the
offense.”).

 





[5]
The indictment alleged, in pertinent part:

 

CECILIO MENDOZA . .
. did then and there, with the specific intent to commit the offense of CAPITAL
MURDER of ROLANDO TRUJILLO, a peace officer who is acting in the lawful
discharge of an official duty and who the DEFENDANT knows is a peace officer,
do an act, to-wit:  discharging a firearm at ROLANDO TRUJILLO which amounted to
more than mere preparation that tended but failed to effect the commission of
the offense intended. 





[6]
On voir dire examination by appellant’s counsel, Detective Clipper admitted that
he did not ask whether appellant was intoxicated or under the influence of
alcohol or crack cocaine.





[7]
Although the interview was video-recorded, and the videotaped statement was
introduced for purposes of the appellate record, the jury was not shown the
video-recording because of concerns that appellant was dressed in prison
attire.  In the second interview, appellant was questioned by Detective Clipper
and Detective Marian Culver.

 





[8]
“Pos” is a colloquial variation of the Spanish slang expression, “pues,” which,
used at the beginning of a sentence, as here, translates roughly as “well.”  See
Elizabeth Reid & Linton H.
Robinson, Mexican Slang Plus Grafitti 38 (2003).





[9]
During cross-examination of Officer Trujillo, appellant’s counsel offered in
evidence Officer Trujillo’s video-recorded statement that was taken by
Detectives Clipper and Culver.  Appellant’s counsel asserted that the
video-recorded statement differed in important respects from Officer Trujillo’s
trial testimony.  However, in the statement, Officer Trujillo stated that when
he felt the shot to his abdomen, he did not know where it came from.  He also
stated that when he re-entered the room, he continued to fire at Limon, then
felt another impact to his knee, a “powerful blow” that entered one side and
exited the other side of his knee.  We are not persuaded that Officer
Trujillo’s video-recorded statement contradicts his trial testimony.





[10]
Officer Briones testified that he created the exhibits by entering room
measurements, the officers’ and suspects’ locations, and other relevant
information into a computer software program.  The computer software, Crime
Zone, utilizes the information to create a three-dimensional representation of
a physical setting.  The software was also used to create State’s Exhibit 546,
a “flat” diagram of the house showing the officers’ and suspects’ locations. 

 





[11]
Among other arguments advanced by appellant’s counsel, he argued that,
“basically what they are trying to say is that Officer Briones is an expert and
he’s an expert in using this type of software and it can be relied upon as
such.”

 





[12]
The State told the trial court that the 3D exhibits were “not a movie” and “not
an animation.”  Rather, the exhibits were “a to-scale diagram using the Head
Zone software called Crime Zone/Crash Zone.  It was used to create the diagram
that’s already been admitted into evidence, and the actual software needed to
project it and to run it is on the computer here.”  Outside the presence of the
jury, at the end of the day, the trial court granted defense counsel a
continuance to view the 3D exhibits to determine whether the defense “had any
other objections.”  After viewing the exhibits outside the presence of the
jury, appellant’s counsel stated his desire to “reserve the rest of [his]
objections for the morning.”  The following morning, outside the presence of
the jury, appellant’s counsel objected to admission of the exhibits on grounds
of “reliability,” “surprise,” and that the exhibits were “highly prejudicial.”

 





[13]
The trial court stated that defense counsel “had two objections . . . [t]he
continuance and the other one was [Officer Briones’s] qualifications or his
ability to operate this.”