

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-21-00574-CR

Miguel **GUTIERREZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 379th Judicial District Court, Bexar County, Texas
Trial Court No. 2019CR9922
Honorable Ron Rangel, Judge Presiding

Opinion by: Liza A. Rodriguez, Justice

Sitting: Irene Rios, Justice
Beth Watkins, Justice
Liza A. Rodriguez, Justice

Delivered and Filed: May 31, 2023

AFFIRMED

A jury convicted Miguel Gutierrez of felony murder in connection with the death of an eleven-month-old baby, X.C.[1] In one issue, Gutierrez argues the evidence is legally insufficient because the State failed to prove beyond a reasonable doubt that he caused X.C.'s death. We affirm.

### BACKGROUND

Gutierrez was charged by indictment with felony murder. The indictment alleged that:

[O]n or about the 3rd day of November 2017, MIGUEL GUTIERREZ, hereinafter referred to as defendant, did then and there commit or attempt to commit the felony

---

[1]The minor children mentioned in this opinion will be referred to by their initials only. *See* TEX. R. APP. P. 9.10(a)(3).

offense of injury to a child, and while in the course of or in furtherance of, the defendant did then and there commit or attempt to commit an act clearly dangerous to human life, to wit: striking, pressing, squeezing, [X.C.] a child, with the hand of the defendant, thereby causing the death of an individual, namely: [X.C.].

Gutierrez pleaded not guilty, and the case proceeded to trial before a jury.

***The State's Evidence***

At trial, the State's evidence showed that on November 3, 2017, at around 3:30 a.m., a 911 dispatcher received a call about an eleven-month-old baby, X.C., who was not breathing and did not have a pulse. Paramedics were immediately dispatched to X.C.'s location, a residence in San Antonio, Texas. Upon arrival, the paramedics found X.C. on a bedroom floor, looking lifeless and very pale. X.C. was not breathing and had no pulse. The paramedics performed cardiopulmonary resuscitation (CPR) on X.C. while transporting him to the emergency room at San Antonio Children's Hospital.

At the hospital, a team of emergency room doctors and nurses treated X.C. for about a half hour, but they were unable to reverse his condition. X.C. was officially pronounced dead by an emergency room doctor. While treating X.C., the emergency room team noticed that X.C. had bruises and abrasions on his head, torso, and limbs, including bruises in protected areas like his testicles and ears. X.C. also had numerous bruises on his abdomen.

The Bexar County Medical Examiner's office performed an autopsy and prepared an autopsy report, which revealed that X.C. had numerous external and internal injuries.[2] The external injuries included bruises on X.C.'s abdomen, some of which were "acute" or recent injuries. The internal injuries included three "[a]cute blunt force injuries" to the abdomen, specifically, (1) a laceration or tear of the mesentery of the bowel; (2) a contusion or bruising of the pancreas; and

---

[2]In addition to the injuries detailed below, X.C. had acute and healing blunt force injuries of the head, inner lips, trunk, and extremities, and healing rib fractures.

(3) a contusion or bruising and an abrasion of the genital region with an extensive hemorrhage around the left testicle. The autopsy report noted that X.C. had "a large area of lacerated mesentery with exposed vessels and avulsed mesenteric fatty tissue" and that although his pancreas was not lacerated, it had a "hemorrhagic portion" "extend[ing] the full thickness of the organ." The autopsy report concluded that X.C. had died from blunt force injuries to the abdomen and that the manner of death was homicide.

The police determined that Gutierrez was the adult in charge of X.C. at the time of his death. X.C.'s mother, Selena Moya, had gone to work at around 10:00 the previous night, leaving X.C. and her three other children in Gutierrez's care.

The police interviewed Gutierrez twice. Initially, Gutierrez told police that X.C. fell off the bed that night and he theorized that X.C. was injured by the fall. Later, Gutierrez told police that he would "play with" X.C. and "like squeeze his stomach and stuff," but he claimed he "never beat on" X.C. Gutierrez admitted he "squeezed" X.C.'s stomach on the night that X.C. died. Using a teddy bear, Gutierrez demonstrated how he "squeezed" X.C.'s stomach. During this demonstration, Gutierrez used both hands, forcefully pressing his body weight into the teddy bear multiple times. Gutierrez told the police that after he "was pushing down on [X.C.'s] stomach," X.C. was "good"—he was looking up at Gutierrez and drinking his bottle. However, "about fifteen, twenty, to twenty-five" minutes later, Gutierrez noticed that something was wrong with X.C.—he did not want his bottle anymore and was not moving. Gutierrez told the police that when he realized that X.C. was not breathing, he performed CPR on him. Thereafter, Gutierrez directed his mother call 911 and he went to Moya's workplace to tell Moya what had happened to X.C.

Joe Palacios, Gutierrez's friend, testified that he drove Gutierrez to Moya's workplace. Gutierrez told Palacios he was going to be blamed for what happened to X.C. and he was scared. After telling Moya about X.C., Gutierrez did not want to return to his house. Palacios told Gutierrez

his absence did not "look right" and he encouraged Gutierrez to return to his house. Eventually, Gutierrez agreed to return to his house.

X.C.'s oldest sibling, A.C., was six years old when X.C. died. A.C. testified that before she and her siblings fell asleep that night, she saw Gutierrez slap X.C. At the time, her family was living with Gutierrez. A.C. could not remember exactly how long her family lived with Gutierrez, but she thought it was for months. A.C. did not like living with Gutierrez because her mother and Gutierrez mistreated her and her siblings. Gutierrez not only hit A.C., he also punched and slapped X.C. and "push[ed] him very hard on the ground" "a lot of times."

Dr. Tracy McCallin, the supervising doctor who treated X.C. in the emergency room, testified that when X.C. arrived in the emergency room he was not breathing on his own, he did not have a heartbeat, and his pupils were fixed and dilated. She noted that when a patient comes into the emergency room in a cardiopulmonary arrest state like X.C., the emergency room team tries to figure out if there are any possible reversible causes for that arrest state. Dr. McCallin was concerned that she might not be able to save X.C. Nevertheless, she and the emergency room team wanted to do everything they could to try to reverse X.C.'s condition before calling a time of death. The emergency room team performed CPR and administered various other treatments to X.C., but these efforts were unsuccessful. X.C. remained in cardiac arrest and never breathed on his own.

Dr. McCallin testified that the injuries she observed on X.C. were consistent with blunt force trauma and inconsistent with falling from a bed. Based on the nature of some of X.C.'s injuries, which were on protected parts of the body like the scrotum and the ears, the emergency room team suspected child abuse and they called for a forensic team.

Christopher Fink, one of the paramedics, testified that he secured an airway for X.C. by intubating him while en route to the hospital. Fink confirmed that the endotracheal tube was

properly placed in X.C.'s trachea by auscultating breath sounds,[3] observing condensation in the tube, and obtaining carbon dioxide measurements.

On the topic of intubation, Dr. McCallin testified that she noticed the endotracheal tube placed by Fink was in X.C.'s esophagus, rather than his trachea. Another emergency room doctor re-intubated X.C. Dr. McCallin explained that endotracheal tubes are prone to dislodging in babies because they have very short airways. Typically, this dislodging happens when the baby is being wheeled from the ambulance into the emergency room or being moved from the gurney to the hospital bed. Dr. McCallin further testified the "uncuffed" type of endotracheal tube used to intubate X.C. in the ambulance was appropriate, even though a different type of endotracheal tube, a "cuffed" tube, was used in the emergency room. Dr. McCallin emphasized that X.C.'s condition when he was picked up by the paramedics and his condition when he arrived in the emergency room were exactly the same. Dr. McCallin opined that changes in X.C.'s intubation in the ambulance would not have changed the outcome for X.C.

In her testimony, Dr. Kimberly Molina, the chief medical examiner, provided important context for evaluating the autopsy findings. According to Dr. Molina, the mesentery is "a bunch of soft tissue" that is "kind of the scaffolding" that "holds the intestines into [the] body." The pancreas is an organ located behind the mesentery. During an autopsy, a medical examiner may remove tissue samples from the injuries and examine them under a microscope. This can be helpful in deciphering the age of the injury. Dr. Molina explained that the body responds to injuries by sending specific types of cells to the injured area in a particular order—the "cleanup" cells appear first and the repair cells appear later. When a medical examiner looks at tissue samples under a microscope and does not find cleanup or repair cells, it signals that the healing response has not

---

[3]At the time, paramedics were providing X.C. medically assisted breathing with a bag valve mask.

started and that the injury is acute or recent. The timing of this healing response varies depending on the location of the injury. Additionally, upon death, the body ceases to heal.

In this case, the autopsy report revealed that X.C.'s external injuries included eighteen bruises on his abdomen and his internal injuries included a lacerated mesentery and bruising of the pancreas. Microscopic examination of samples taken from X.C.'s injured mesentery revealed "really no evidence of significant healing." Microscopic examination of samples taken from X.C.'s injured pancreas revealed "no evidence of healing." Microscopic examination of samples taken from X.C.'s injured left testicle revealed "no evidence of healing." Based on this evidence, Dr. Molina concluded that each of these internal injuries were recent.

Dr. Molina pointed out that the autopsy revealed a significant amount of blood in X.C.'s abdomen—approximately a quarter of his total blood volume. The bleeding from X.C.'s lacerated mesentery had "leaked" into X.C.'s abdomen. The blood found in X.C.'s abdomen at autopsy was "dark maroon and liquid," further indicating the lacerated mesentery was a recent injury. Dr. Molina opined that the bleeding from X.C.'s lacerated mesentery likely caused X.C.'s death. In other words, X.C. bled to death. Dr. Molina noted that X.C.'s symptoms in both the ambulance and the emergency room—not breathing, no pulse, and a poor capillary refill time—were consistent with X.C.'s mesentery injury. Dr. Molina further concluded that the bruised pancreas did not likely cause X.C.'s death; however, it was part of the blunt force trauma to X.C.'s abdomen.

Dr. Molina testified that X.C.'s lacerated mesentery and his bruised pancreas were caused by some sort of trauma or external force. Dr. Molina explained that X.C.'s mesentery and his pancreas were in effect "trapped" between the external force and the backbone, thereby resulting in injuries to these organs. She further noted that X.C. had three bruises on his lower back that "might correspond to this situation." Dr. Molina opined that the external force could have come from any location on X.C.'s abdomen, but the direction of the force must have pointed toward the

mesentery and the pancreas. After viewing the videotape of Gutierrez demonstrating how he forcefully pressed down on X.C.'s abdomen, Dr. Molina testified that the force with which Gutierrez pressed on X.C.'s stomach would be endangering to human life and that the actions Gutierrez demonstrated were consistent with the injuries in the autopsy findings.

***The Defense's Evidence***

The defense presented testimony from two witnesses. The first defense witness, Holly Willson, was a forensic interviewer for ChildSafe. Willson had interviewed X.C.'s five-year-old brother, I.M., shortly after X.C.'s death. During the interview, I.M. told Willson that his mother, Moya, punished him by "hurt[ing]" his "wee-wee."

The second defense witness, Monica Castillo, was Gutierrez's second cousin and she lived behind Gutierrez's house. Castillo testified that Moya was Gutierrez's friend, and she would stay at his house with her children. Castillo saw Moya abuse her children by hitting them "in the back of the head" and "on their backs real hard" and by leaving them in her truck when it was hot. Castillo did not report the abuse, but claimed she was on the verge of reporting it when X.C. died. Castillo further testified that she went over to Gutierrez's house when X.C. stopped breathing and she was there during the 911 call. The 911 dispatcher told her how to perform CPR on X.C. and she did so until the paramedics arrived and took over.

***The Jury Charge, Closing Arguments, and the Verdict***

The jury charge included an instruction on concurrent causation.[4] *See* TEX. PENAL CODE § 6.04(a).[5] Specifically, the jury was instructed:

---

[4]We express no opinion about whether a concurrent causation instruction was proper in this case.

[5]Section 6.04(a) of the Texas Penal Code states: "A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." TEX. PENAL CODE § 6.04(a).

> [Y]ou cannot find the defendant [] Gutierrez guilty unless you believe beyond a reasonable doubt that the death of [X.C.] would not have occurred but for the conduct of [] Gutierrez, operating alone or concurrently with another cause. So that if you believe that the conduct of Emergency Medical Technician Christopher Fink and/or the conduct of Selena Moya was a concurrent cause sufficient to cause the death of [X.C.]., and the conduct of [] Gutierrez was clearly insufficient, or if you have a reasonable doubt thereof, you will acquit [] Gutierrez and say by your verdict not guilty.

In closing arguments, the State argued that the evidence showed that Gutierrez pressed and squeezed on X.C.'s stomach—just as he demonstrated for the police—and that this blunt force trauma tore X.C.'s mesentery and caused X.C. to bleed to death. The State reminded the jury that but for Gutierrez's actions, the paramedics never would have been called to Gutierrez's house in the first place and they never would have been there trying to save X.C.'s life. The State reminded the jury that the medical examiner, Dr. Molina, did not conclude that an intubation tube caused X.C.'s death; to the contrary, she concluded that blunt force trauma to the abdomen caused X.C.'s death. The State further argued that the evidence showed that X.C. had died before the paramedics even arrived at Gutierrez's house. Finally, the State argued that even if Moya had inflicted some of X.C.'s other injuries, Moya was at work when X.C. suffered from the blunt force trauma that caused him to bleed to death.

The defense argued that X.C.'s injuries were not caused by Gutierrez, but by X.C.'s mother, Moya. The defense highlighted the autopsy report findings that X.C. had old and new injuries and argued that Moya, not Gutierrez, was "present at all times." The defense emphasized that X.C.'s genitals were injured and that his older sibling, I.M., said his mother "hurts" his "wee wee." The defense further urged the jury to consider the evidence indicating that the paramedics improperly intubated X.C., thereby depriving him of oxygen while he was being transported to the hospital.

The jury found Gutierrez guilty of felony murder. The trial court held a sentencing hearing and assessed punishment at life in prison. Gutierrez appealed.

## APPLICABLE LAW

When reviewing the sufficiency of the evidence to support a conviction, we consider the evidence in the light most favorable to the verdict. *Edward v. State*, 635 S.W.3d 649, 655 (Tex. Crim. App. 2021). We must uphold the verdict if any rational trier of fact could have found all the essential elements of the offense proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Edward*, 635 S.W.3d at 655. "We measure the sufficiency of the evidence against the hypothetically-correct jury charge, defined by the statutory elements as modified by the charging instrument." *Edward*, 635 S.W.3d at 656.

In conducting a legal sufficiency review, we determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). "This standard tasks the [jury] with resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts." *Id*. "[W]hile jurors may not base their decision on speculation or unsupported inferences, they may draw reasonable inferences from the evidence." *Edward*, 635 S.W.3d at 655. We presume that the jury resolved any inconsistencies in the evidence in favor of the verdict and we defer to the jury's resolution of these matters. *Murray*, 457 S.W.3d at 448-449. "When the record supports conflicting inferences, we presume that the [jury] resolved the conflicts in favor of the verdict, and we defer to that determination." *Id*. "The evidence is sufficient to support a conviction, and thus the jury's verdict is not irrational, if the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict." *Edward*, 635 S.W.3d at 655-56.

"Felony murder is an unintentional murder committed in the course of committing a felony." *Fuentes v. State*, 991 S.W.2d 267, 272 (Tex. Crim. App. 1999). In this case, the underlying felony offense was injury to a child. *See* TEX. PENAL CODE § 22.04. The Texas Penal Code provides that a person commits the offense of felony murder if he "commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt . . . he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE § 19.02(b)(3). The essential elements of felony murder are (1) the underlying felony; (2) an act clearly dangerous to human life; (3) the death of an individual; (4) causation, that is, the dangerous act causes the death; and (5) a connection between the underlying felony and the dangerous act. *Contreras v. State*, 312 S.W.3d 566, 583–84 (Tex. Crim. App. 2010); *see* TEX. PENAL CODE § 19.02(b)(3). "The offense of 'injury to a child' can qualify as an underlying felony in a felony murder prosecution." *Contreras*, 312 S.W.3d at 584.

## ANALYSIS

On appeal, Gutierrez argues that the evidence is insufficient as to the causation element of the offense, arguing that the jury's finding that he caused X.C.'s death rested on speculation and unsupported inferences. According to Gutierrez, the State proved that he was the "custodial adult" at the time of X.C.'s death, but it did not prove that he caused X.C.'s death. Gutierrez further argues that in reaching a guilty verdict the jury speculated that he, rather than X.C.'s mother, Moya, caused X.C.'s death.

The Texas Penal Code provides: "A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." TEX. PENAL CODE § 6.04(a). "The scope of causation under the Texas Penal Code is broad, allowing courts to find causation where 'the result would not have occurred but for [the

actor's] conduct, operating either alone or concurrently with another cause.'" *Cyr v. State*, No. PD-0257-21, 2022 WL 17825857, at \*5 (Tex. Crim. App. Dec. 21, 2022) (quoting TEX. PENAL CODE § 6.04(a)). "[A]n actor need not be the sole cause of the harm." *Id*. "Causation is established where the conduct of the defendant is the 'but for' cause 'operating alone or concurrently with another cause.'" *Id*. (quoting TEX. PENAL CODE § 6.04(a)).

In her testimony, Dr. Molina provided detailed testimony about the extent of X.C.'s internal injuries, focusing on his lacerated mesentery and bruised pancreas. Dr. Molina testified that the laceration of X.C.'s mesentery and the bruising of his pancreas were caused by some sort of external force to X.C.'s central abdomen. X.C.'s mesentery and his pancreas were "trapped" between the external force and X.C.'s backbone, resulting in injuries to the mesentery and pancreas. While the external force could have come from any location on X.C.'s abdomen, it was directed toward X.C.'s mesentery and the pancreas.

During a videotaped police interview, Gutierrez told the police that he had pressed and squeezed X.C.'s stomach and he demonstrated how he did it: Gutierrez used both hands to forcefully press his body weight into a teddy bear multiple times. After watching the videotape, Dr. Molina testified that Gutierrez's actions were consistent with the findings in the autopsy report, that is, that X.C. died as the result of blunt force injuries to the abdomen. From this evidence, the jury could have reasonably inferred that Gutierrez's actions caused X.C.'s lacerated mesentery.

As to timing, Dr. Molina testified that the injuries to X.C.'s mesentery, pancreas, and testicles were recent injuries because microscopic examinations of the tissue samples showed no sign of significant healing as to any of these injuries. Additionally, Gutierrez told the police that he noticed that something was wrong with X.C. fifteen to twenty-five minutes after he pressed down and squeezed on X.C.'s stomach. Dr. Molina agreed that this fifteen to twenty-five minute interval between Gutierrez's actions and X.C.'s reaction was consistent with the internal injuries

described in the autopsy report. Finally, the evidence showed that Moya was at work and had no access to X.C. in the hours immediately preceding his death. Based on the evidence presented, the jury could have reasonably inferred that Gutierrez inflicted the blunt force injuries that caused X.C.'s death. *See Edward*, 635 S.W.3d at 655 (recognizing that while jurors are not permitted to base their decision on "mere speculation," they are permitted to draw reasonable inferences from the evidence).

Next, Gutierrez argues that the jury was required to speculate on a number of fact issues to reach its guilty verdict, namely: (1) whether the blunt force trauma to X.C.'s mesentery was caused by an assault or by amateurs providing him CPR; (2) whether X.C. arrived at the hospital alert and responsive or non-responsive; and (3) whether an improper intubation deprived X.C. of oxygen while he was being transported to the emergency room.[6] However, the jury could have resolved these fact issues without engaging in any speculation. First, Dr. Molina testified that it was possible that some of the bruises on X.C.'s lower chest and upper abdomen may have been caused by someone performing CPR, albeit incorrectly; however, she also testified that the bruises on X.C.'s central and lower abdomen were inconsistent with performing CPR and were consistent with blunt force trauma. Second, the paramedics who treated X.C. in the ambulance, and Dr. McCallin, who treated X.C. in the emergency room, testified that X.C. was nonresponsive the entire time they treated him. Third, one of the paramedics, Fink, testified that he intubated X.C. while en route to the emergency room and he confirmed that the endotracheal tube was properly placed. Additionally, Dr. McCallin testified that endotracheal tubes are prone to dislodging in babies, that this dislodging typically happens when babies are transferred from the ambulance to the

---

[6]Gutierrez also argues that he was guilty of reckless bodily injury to a child instead of felony murder. However, because the jury found Gutierrez guilty of the greater charged offense, it was not required to consider the four possible lesser included offenses contained in the jury charge.

emergency room, and that the type of endotracheal tube the paramedic used on X.C. was within the standard of care. While these fact issues may have been important to the defensive theories presented at trial, they are not relevant to a legal sufficiency review of the causation element of the offense. Here, our task is to determine if the evidence is legally sufficient to establish that Gutierrez caused X.C.'s death.

To the extent Gutierrez is arguing that he should have been exonerated based on a concurrent cause, we reject his argument. "[A] defendant may be exonerated under section 6.04 'only if the concurrent cause was clearly sufficient, operating alone, to produce the result and the accused's conduct alone was clearly insufficient to do so.'" *Hernandez v. State*, 938 S.W.2d 503, 513 (Tex. App.—Waco 1997, pet. ref'd) (quoting *McFarland v. State*, 928 S.W.2d 482, 516 (Tex. Crim. App. 1996)). "Causation is established where the conduct of the defendant is the 'but for' cause 'operating alone or concurrently with another cause.'" *Cyr*, 2022 WL 17825857, at \*5 (quoting TEX. PENAL CODE § 6.04(a)). Accordingly, there was no need to show that Gutierrez was the sole cause of harm to X.C. to satisfy the causation element of the offense. *See id*.

Here, the evidence and the reasonable inferences therefrom established that: (1) X.C. died from an internal injury—a lacerated mesentery, which caused him to bleed to death; (2) X.C.'s lacerated mesentery was caused by blunt force trauma to his abdomen; (3) Gutierrez inflicted the blunt force trauma by pressing or squeezing X.C.'s stomach. Considered together in a light most favorable to the verdict, the evidence is legally sufficient for a rational jury to conclude beyond a reasonable doubt that Gutierrez caused X.C.'s death. We overrule Gutierrez's issue.

CONCLUSION

The trial court's judgment is affirmed.

Liza A. Rodriguez, Justice

DO NOT PUBLISH